Daniel H. Deutsch and Evelyn M. Deutsch, et al. [1] v. Commissioner. Deutsch v. Commissioner
Docket Nos. 114-65 - 116-65.
United States Tax Court
T.C. Memo 1967-142; 1967 Tax Ct. Memo LEXIS 116; 26 T.C.M. (CCH) 649; T.C.M. (RIA) 67142; June 28, 1967
Dermot R. Long, for the petitioners. Roger Rhodes, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in income taxes of Daniel H. and Evelyn M. Deutsch, Alfred and Bernice Deutsch, and William and Ethel Drell, for the calendar year 1960 in the respective amounts of $45,016.13, $23,046.13, and $28,695.09. By amendment to his answer respondent in the alternative claimed an increased deficiency of $24,416.05 in income tax for the calendar year 1960 from Alfred and Bernice Deutsch. The issue for decision is whether each group of petitioners realized income in the calendar year 1960 in the amount of the fair market value at the date of transfer of stock transferred *117 to them for services rendered in prior years or whether this stock was constructively received by petitioners in 1959 and if income was realized by petitioners in 1960 from the receipt of the stock, the amount thereof. Findings of Fact Some of the facts have been stipulated and are found accordingly. Daniel H. Deutsch and Evelyn M. Deutsch, husband and wife, who resided at the time their petition in this case was filed in Pasadena, California, filed their joint Federal income tax return for the calendar year 1960 with the district director of internal revenue at Los Angeles, California. Alfred Deutsch and Bernice Deutsch, husband and wife, who resided at the time their petition in this case was filed in Pasadena, California, filed their joint Federal income tax return for the calendar year 1960 with the district director of internal revenue at Los Angeles, California. William Drell and Ethel Drell, husband and wife, who resided at the time their petition in this case was filed in Pasadena, California, filed their joint Federal income tax return for the calendar year 1960 with the district director of internal revenue at Los Angeles, California. All of petitioners used the *118 cash basis of accounting in computing their income reported on their Federal income tax returns. Alfred Deutsch, Daniel H. Deutsch and William Drell (hereinafter referred to collectively as petitioners or individually by their given names) are chemists. In 1952 they incorporated the Foundation for Biochemical Research (hereinafter referred to as the Foundation) as a non-profit California corporation. The primary purpose of the Foundation was the preparation and distribution to scientists of biochemicals which were needed in research but which were not commercially available. Daniel was president of the Foundation, William was vice president, and Alfred was secretary-treasurer. Daniel, William and Alfred were members of the eight-member board of trustees of the Foundation. In 1958 the board of trustees of the Foundation decided that the Foundation should confine its activities to research and in March of that year, the California Corporation for Biochemical Research (hereinafter referred to as the Corporation) was incorporated under the laws of California by Alfred, Daniel and William to take over the commercial activities of the Foundation's operations by engaging in the manufacture *119 and sale of biochemicals. Daniel was president, William, vice president, Alfred, secretary-treasurer, Bernice Deutsch, assistant secretary, and Cynthia Welch, assistant treasurer of the Corporation. During a part of the time from its incorporation through the year 1960, Bernard Malin was treasurer of the Corporation. The directors of the Corporation were Alfred, Daniel, and William, and for a portion of the period from its incorporation through the year 1960 Bernard Malin was a director. The Corporation was authorized to issue common stock (par value $1) and preferred stock (par value $100), which was convertible to common stock, under certain conditions, at the ratio of one hundred shares of common stock for each share of preferred stock. In March 1958, the Foundation agreed to turn over the operation of its business to the Corporation and the Corporation assumed operation of the business in that month. In September 1958 an agreement was entered into between the Foundation and the Corporation whereby all the operating assets of the Foundation were to be transferred to the Corporation in exchange for 1,920 shares of preferred stock of the Corporation and 116 shares of common *120 stock of the Corporation. This agreement was subject to the approval of the Commissioner of Corporations of the State of California (hereinafter referred to as the Corporation Commissioner). On October 24, 1958, the Foundation and the Corporation executed an "Agreement, Bill of Sales and Assignment" to carry into effect the agreement reached in September 1958. The assets of the Foundation were transferred to the Corporation in October 1958. These assets were valued at $192,116.72. The agreement between the Foundation and Corporation provided that the certificates for the 1,920 shares of preferred and 116 shares of common stock of the Corporation to be issued to the Foundation would be placed in escrow pursuant to an escrow agreement, a copy of which was attached to the agreement between the Foundation and the Corporation. The stock could not be issued to the Foundation until approval was obtained from the Corporation Commissioner and until the Corporation had complied with certain requirements of the Securities and Exchange Commission. The Corporation filed an application with the Corporation Commissioner requesting, among other things, permission to issue to the Foundation 1,920 *121 shares of preferred stock, and 116 shares of common stock, permission to sell 150,000 shares of common stock to the public, and permission to issue 150,116 shares of common stock to Daniel, William and Alfred, the promoters of the Corporation. This application contemplated that the Foundation's shares would be issued and placed in escrow prior to the sale of any shares to the public and prior to the issuance of any promotional shares. As a condition for authorizing the issuance of stock by the Corporation (and for authorizing sale to the public of 150,000 shares of common stock), the Corporation Commissioner imposed certain restrictions upon the shares to be issued to the Foundation, and upon the promotional shares, which restrictions were set forth in the permit dated October 23, 1958 authorizing the issuance and public sale of the stock. The permit provided for the issuance by the Corporation to the Foundation of 1,920 of its preferred shares and 116 of its common shares in payment for the assets of the Foundation transferred to the Corporation and for the conversion of the preferred shares to common shares on a basis of 100 shares of common for 1 share of preferred with the *122 following restrictions and conditions: (b) that none of the shares authorized * * * [to be issued to the Foundation and the promoters] shall be sold or issued unless and until applicant shall have selected an escrow holder and said escrow holder shall have been first approved in writing by the Commissioner of Corporations; that, when issued, all certificates evidencing any of said shares shall be forthwith deposited with said escrow holder, to be held as an escrow pending the further written order of the said Commissioner; that the receipt of said escrow holder for said certificates shall be filed with said Commissioner; and that any owner or person entitled to said shares shall not consummate a sale or transfer of said shares, or any interest therein, or receive any consideration therefor, until the written consent of said Commissioner shall have been obtained so to do. The permit placed additional restrictions upon the sale of the stock which was to be issued to the promoters. The Corporation designated the Union Bank of Los Angeles as escrow holder for the shares to be issued to the Foundation and to the promoters pursuant to the permit and on October 23, 1958 the Corporation *123 Commissioner approved such designation. The escrow agreement provided for release of the stock placed in escrow upon application for such release to and authorization for such release by the Corporation Commissioner and if a public offering of the stock were made in no event in less than one year from the commencement of the public offering. The Corporation on October 28, 1958, placed in escrow with the Union Bank 1,920 shares of preferred and 116 shares of common stock to be held for the Foundation in accordance with the escrow agreement and subject to the restrictions set forth in the permit. Between October 27, 1958 and April 24, 1959, 150,000 shares of the common stock of the Corporation were sold to the public at $1 per share. These 150,000 shares constituted all of the stock authorized by the Corporation Commissioner to be sold to the public. In October 1958, the Foundation owed the petitioners the following amounts representing salaries for services previously performed as officers of the foundation: Daniel Deutsch
$ 9,267
Alfred Deutsch
5,443
William Drell
6,452
Total
$21,162
Subsequent to October 1958 and until sometime in 1960 the Foundation *124 continued to accrue additional salaries payable to petitioners. In October and November 1958 petitioners discussed with the other trustees of the Foundation taking some of the stock of the Corporation issued or to be issued to the Foundation for the back salaries due them at the rate of $1 per share of common stock. At the time of these discussions petitioners and the other trustees were all aware that it would be at least a year and perhaps longer before the preferred stock could be released from the escrow agreement and converted to common stock. Petitioner and the other trustees were aware of the restrictions placed on the issuance and sale of the stock by the Corporation Commissioner in granting the permit to issue the stock. Sometime late in 1958 or early in 1959 petitioners and the other trustees of the Foundation reached an agreement with respect to transfers of stock of the Corporation to petitioners for back salaries. Bernard Malin (hereinafter referred to as Malin) is an attorney and a certified public accountant. He had done some work for the Foundation and in October 1958 the Foundation owed him approximately $10,000. Malin suggested to Alfred that he be paid in stock. *125 Alfred discouraged bringing this proposition before the Board of Trustees of the Foundation. Later Alfred, Daniel and William discussed with Malin the sale to him of a portion of the stock they were considering taking in payment of back salaries owed to them by the Foundation. At the time of these discussions Malin could have purchased stock from the public offering at $1 a share but did not have funds immediately available for the purchase of such shares partially because of not having received payment from the Foundation for the amount of fees owing to him. Malin was at the time doing work for the Corporation and Alfred, Daniel and William were desirous of having Malin continue working for the Corporation and of having him have a financial interest in the Corporation. In January 1959 petitioners entered into an agreement with Malin to sell him at $1 per share one-fourth of the 21,162 shares of stock which was the aggregate amount to be transferred to them by the Foundation for back salaries. To provide the 5,290 shares to be sold to Malin petitioners agreed among themselves that Daniel and William would each sell Malin the shares due them by the Corporation in excess of 5,291 and *126 Alfred would sell to Malin the shares due him in excess of 5,290 shares. [2] Later each petitioner agreed to give to Malin 5,000 of the promotional shares which he received in return for Malin's agreement to become employed by the Corporation. The agreement of Alfred, Daniel and William and the other trustees of the Foundationwith respect to the back salaries due to petitioners by the Foundation being satisfied by transfer to them of stock was reduced to writing on January 3, 1959, and signed by Alfred, Daniel and William only. The instrument was entitled "Memo of Agreement" and read as follows: The undersigned officers hereby agree that they will not request cash payment in satisfaction of the back salaries now owing to them and standing on the books of the Foundation, but will accept in lieu of cash an equal amount of common stock of Calif. Corp. for Biochemical *127 Research as follows: Alfred Deutsch
5,443 shs.
Daniel H. Deutsch
9,267 shs.
William Drell
6,452 shs. They further agree that these shares of stock be transferred to them in due course after the Foundation preferred stock has been released from escrow and converted to common shares, provided that such shares are transferred within 5 years of this date. On January 11, 1960, the Corporation filed an application with the Corporation Commissioner to withdraw from escrow the 1,920 shares of preferred stock and 116 shares of common stock held for the Foundation. The Corporation Commissioner on January 20, 1960, issued an order partially terminating the escrow which order constituted his consent to the withdrawal of 1,920 preferred and 116 common shares. These shares were delivered to the Foundation and on February 15, 1960, the Foundation caused 242 shares of preferred stock to be converted into 24,200 shares of common stock. This was accomplished by having the Corporation cancel the 242 preferred shares and issue the 24,200 common shares to the Foundation. The minutes of the meeting of the board of trustees of the Foundation held March 24, 1960 contained the following *128 statement and resolution with respect to these shares: TRANSFER OF STOCK: The Board discussed the agreement made on January 3, 1959 whereby 21,162 shares of Common Stock, then valued at approximately $1.00 per share, were to be exchanged for a like amount of back salaries accumulated on the books of the Foundation since 1953. The Board was in agreement that this arrangement was properly entered into and after due consideration the following resolution was unanimously adopted: RESOLVED, THAT the Officers be instructed to confer with Counsel with the view towards implementing as expediously as possible the memo of agreement, dated January 3, 1959. On April 7, 1960, the Foundation endorsed certificates representing 21,162 shares of common stock of the Corporation and delivered those certificates to the petitioners. The petitioners had decided that to facilitate the sale to Malin of the stock which they had previously agreed to sell him, the new certificate for the 5,290 shares to be sold to him would be issued by the Corporation in Alfred's name. The books and records of the Corporation indicate that on May 5 and 6, 1960, new certificates were issued by the Corporation to the *129 petitioners as follows: Alfred Deutsch
10,580
Daniel Deutsch
5,291
William Drell
5,291
21,162
During 1960, but subsequent to May of that year, Alfred transferred 5,290 of the shares issued by the Corporation to him in May to Malin who paid him $5,290 therefor which amount was divided among petitioners on the basis of the number of shares each had agreed to sell to Malin. At all times between October 15, 1959 and May 30, 1960, the fair market value of the common stock of the Corporation was $8 per share. None of petitioners reported on his income tax return for the calendar year 1959 any income with respect to the 21,162 shares of stock which was the subject of the January 3, 1959 Agreement. Each of petitioners on his Federal income tax return for the calendar year 1961 reported capital gain from sales of stock of the Corporation which was stated to have been acquired on April 7, 1960. The stock sold by each petitioner in 1961 was stock received from the Foundation pursuant to the Agreement of January 3, 1959. A document submitted to the Corporation Commissioner by the Corporation entitled "Offering Circular" dated April 27, 1961, contained the statement *130 that "during 1960 the three directors of the Corporation, who are also three of eight trustees of the Foundation, received accrued officers' salaries due from the Foundation in the form of 21,162 shares of common stock of the Corporation." The accrued salaries payable to the petitioners remained as liabilities on the books and records of the Foundation until April 30, 1960, at which time an adjusting entry was made reflecting payment by a distribution of 21,162 shares of stock of the Corporation then held in the Foundation's investment account. Each of petitioners on his Federal income tax return for the calendar year 1960 which was prepared by Malin reported an amount as income from salary attributable to the receipt of the stock from the Foundation. The amount reported by each was as follows: Stock (at $1.00
Tax
Per Share)
Withheld
Total
Alfred
$ 5,443.00
$1,268.00
$ 6,711.00
Daniel
9,267.00
1,600.00
10,867.00
William
6,452.00
1,450.00
7,902.00
$21,162.00
$4,318.00
$25,480.00
The amount of withholding represented salaries credited by the Foundation to each petitioner after October 1958. Respondent in his notice of deficiency *131 to Daniel for the calendar year 1960 increased his income as reported by $73,209.30 with the explanation that it was determined that the 9,267 shares of stock acquired by him in April 1960 and reported by him in his income tax return at $1 per share had a fair market value of $8.90 per share. In his notices of deficiency to Alfred and William respondent increased income as reported for the calendar year 1960 by $42,999.70 and $50,970.80, respectively, with a similar explanation except that the reference was to 5,443 and 6,452 shares of stock, respectively. By amendment to answer respondent alleged in the alternative that Alfred's income for the calendar year 1960 should be increased by $79,197 representing 10,580 shares at $8 per share less the $5,443 from receipt of stock of the Corporation reported by Alfred. Opinion Petitioners contend that each acquired title to his portion of the 21,162 shares of stock of the Corporation the certificate for which was transferred to him in 1960 in the calendar year 1959. It is their position that the Agreement of January 3, 1959 vested title in them to the shares of stock as distinguished from the certificates for the shares. Petitioners contend *132 that if this Agreement did not constitute actual receipt by them of the stock, it constituted constructive receipt. Petitioners recognize that the stock represented ordinary income to them and apparently do not contend that such income is not measured by the fair market value of the stock when received by them either actually or constructively. Since the evidence shows that the fair market value was $1 per share in January 1959 and $8 per share from October 15, 1959, through May 30, 1960, the dispute between the parties is as to when petitioner received the stock. Petitioners use the cash method of accounting and therefore must include in their gross income items of income when such items are received in accordance with section 451(a), I.R.C. 1954. [3]
*133 The terms of the Agreement of January 3, 1959, were that petitioners "will not" request cash but "will accept" common stock of the corporation. These terms are not terms showing the transfer of a present interest but are terms referring to a transfer of an interest in the future. No actual title to the shares, as distinguished from the certificates, or to the certificates was vested in petitioners by the January 3, 1959 Agreement. The facts of this case do not support petitioners' contention that the stock was constructively received by them prior to 1960. [4] The permit issued by the Corporation Commissioner on October 23, 1958 was subject to the express condition that the shares in question should not be issued unless they were deposited with an escrow holder approved by the Corporation Commissioner, that the shares were to be held in escrow until permitted to be released by the written order of the Corporation Commissioner, and that any owner or person entitled to the shares shall not consummate a sale or transfer of the shares, or any interest therein, or receive any consideration therefor, until the written consent of the Corporation Commissioner shall have been obtained. The *134 Corporation Commissioner's authority to impose such condition is granted by the California Corporation Code, Section 25508. [5]
*135 At the beginning of 1960 the stock was held in escrow by the Union Bank under conditions imposed by the Corporation Commissioner. The Foundation was prohibited by the permit from transferring the shares, or any interest therein, to anyone without the written permission of the Corporation Commissioner. Such permission was not requested until January 11, 1960, and was not granted until January 22, 1960. Under these circumstances there were substantial restrictions on petitioners' control of receipt of the shares and therefore there was no constructive receipt of the shares prior to 1960. In La Motte T. Cohu, 8 T.C. 796 (1947) we considered the effect of restrictions on the issuance of promotional stock and concluded that restrictions comparable to those here involved were such that the stock was not actually or constructively received until the restrictions were released. In that case we pointed out that the taxpayer's contractual right to receive stock in the future was neither constructive receipt of the stock nor the receipt of property in payment for services since the nature of the contract was not such that the contract itself was accepted as payment by the cash *136 basis taxpayer. The same situation exists in the instant case. The Agreement of January 3, 1959 did not itself constitute payment to petitioners but provided for payment in the future. In this respect, the Agreement was no more payment to petitioners than was the entry of the salaries due them on their accounts on the Foundation's books. The agreement even provided that the shares were to be "transferred within five years of this date" thus placing a time limitation on its performance. The provisions of this agreement constitute neither actual nor constructive receipt of the property which the agreement provides "will be" transferred. Even if stock is actually transferred subject to such restrictions as to its use as to deprive the person to whom it is transferred from having the normal incidents to ownership thereof, it has not been constructively received. Fred C. Hall, 15 T.C. 195 (1950), affirmed per curiam 194 F. 2d 538 (C.A. 9, 1952). In the instant case there was no transfer of the stock or attempt by the Foundation to transfer the stock to petitioners prior *137 to 1960. Had an attempt been made by the Foundation to transfer the shares to petitioners without the delivery of the certificates which is the method of transfer provided for by section 2466 of the California Corporation Code, the result under section 2473 of the California Corporation Code would be that the attempted transfer would constitute a promise to transfer. [6]
Petitioners contend that under California law under some circumstances delivery of the stock certificate to the purchaser is not essential to passing of title to the stock, citing Robbins v. Pacific Eastern Corporation, 65 P. 2d 42 (Sup. Ct., Calif., 1937). In that case the Court stated at page 59: It is, of course, true * * * that in all cases *138 physical delivery of the certificates is not necessary to effectuate the transfer of title to shares of stock. * * * These cases correctly hold that certificates are only the evidence of ownership of shares of stock, * * *. It hardly needs citation of authority to state that under some circumstances title to shares of stock may pass without delivery of the certificates. * * * What we are here considering is not what could have been done, but what these parties, as reasonable men and women, intended to do. The authorities are numerous to the effect that the usual and ordinary course of business is that a contract for the sale of shares is executed by the indorsement and delivery of the certificates * * *. In the instant case petitioners' agreement of January 3, 1959, by its terms contemplated that its provision would be executed "in due course"by transfer to petitioners by the Foundation of shares of common stock after preferred shares had been released from escrow to the Foundation and converted to common shares. The facts distinguish this case from cases involving sales of stock under agreements which provide for payment for the stock to be from dividends declared thereon, a number *139 of which are cited by petitioners. In those cases the question is whether the vendor retained title to the stock sold merely as security for the payment of the purchase price of the stock and all beneficial use of the property including the right to have the dividends applied for his benefit passed to the purchaser. See Estate of Arthur L. Hobson, 17 T.C. 854 (1951), one of the cases relied on by petitioners. In the instant case the Foundation could not dispose of any interest in its shares of the stock of the corporation because those shares were held in escrow and were unavailable to it. Since the Foundation could not dispose of the shares, petitioners could receive no beneficial use or title to those shares. We conclude that petitioners received the stock in 1960 and it is includable in their income in that year at its fair market value. The fair market value of the 5,291 shares received by each Daniel and William and the 5,290 received by Alfred for his own retention is $8 per share the agreed value of the stock from October 1959 through May 1960. There remains the question of whether Alfred received as income the other 5,290 shares the certificates for which *140 were issued to him and if not did the petitioners each receive his portion of these shares at a value of $8 per share or at a value of $1 per share. We have found that the certificate for the 5,290 shares which petitioners had agreed to sell to Malin was issued to Alfred as a matter of convenience. We conclude that the certificate was issued to Alfred merely as agent for all petitioners to facilitate the transfer of the stock to Malin. Therefore, Alfred did not receive the stock in such a way that it constituted income to him but each petitioner received his portion of the stock. This brings us to the question of whether the agreement of petitioners to sell the stock to Malin causes these 5,290 shares of stock to be includable in their income at only $1 a share. It obviously had only an actual value to them of $1 per share since they were committed to sell it to Malin for that price. It has long been settled that where stock is received subject to a contract right of the seller to repurchase, the fair market value of the stock when received does not exceed the repurchase price regardless *141 of how much greater its intrinsic value may be. Helvering v. Salvage, 297 U.S. 106 (1936). Likewise, if there is an option in another to purchase stock at the date it is received by the taxpayer, the value does not exceed the option price. Phil Kalech, 23 T.C. 672 (1955). As stated in Jacob J. Cooley, 33 T.C. 223, 225 (1959) aff'd per curiam 283 F. 2d 945 (C.A. 2, 1960), fair market value "is not to be determined in a vacuum" but must "be determined with respect to the particular property in question * * * subject to any conditions or restrictions on marketability." Petitioners in the instant case had contracted in 1959 to sell 5,290 shares of their stock to Malin for $1 per share. These shares had a fair market value of only $1 per share to petitioners when they were received by them in 1960 and are includable in their income only at that value. As set forth in our findings, Daniel and William each sold Malin the excess of the shares due them over 5,291 and Alfred the excess of the shares * due him over 5,290. This amounted to 3,976 shares for Daniel, 1,161 shares for William and 153 shares for Alfred. Decisions will be *142 entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Alfred Deutsch and Bernice Deutsch, Docket No. 115-65 and William Drell and Ethel Drell, Docket No. 116-65. ↩
2. The record is somewhat confused as to whether Alfred was to also sell only the excess of the shares due him over 5,291 but since it appears from the testimony that Malin got 5,290 of 10,580 shares issued to Alfred, we concluded that Alfred was to retain only 5,290 shares. Obviously 21,162 is not evenly divisible by 4.↩
3. SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION. (a) General Rule. - The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.↩
4. Sec. 1.451-2(a), Income Tax Regs., provides with respect to constructive receipt: Income, although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or * * * so that he may draw upon it at any time * * *. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. Thus, if a corporation credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corporation does not constitute receipt. ↩
5. Sec. 25508. Authority to impose conditions for protection of public. The commissioner may impose conditions requiring the deposit in escrow of securities, the impoundment of the proceeds from the sale thereof, limiting the expense in connection with the sale thereof, the waiver of assets and dividends by the holders of promotional securities, and such other conditions as he deems reasonable and necessary or advisable for the protection of the public and the purchasers of the securities.↩
6. Sec. 2473. Attempted transfer without delivery of certificates. An attempted transfer of title to a certificate or to the shares represented thereby, without delivery of the certificate, constitutes a promise to transfer, and the obligation, if any, imposed by such promise shall be determined by the law governing the formation and performance of contracts.↩