C. JAMES MATHEWS AND JOYCE C. MATHEWS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4401–69.   Filed October 3, 1973.

*Thomas D. Aitken*, for the petitioners.
*Charles L. Dunlap*, for the respondent.

HALL, *Judge:*\* Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Year | Deficiency |
|------|-----------|
| 1964 | $2, 974. 54 |
| 1965 | 2, 774. 21 |
| 1966 | 2, 545. 07 |
| Total | 8, 293. 82 |

The issues for decision are the following:

(1) During the years 1964, 1965, and 1966, are petitioners entitled to rental deductions with respect to payments made to four family trusts?

(2) During the years 1964, 1965, and 1966, are petitioners entitled to business deductions in an amount in excess of that allowed by respondent with respect to business entertainment expenses, business gifts, and club dues claimed by petitioners?

(3) Are petitioners entitled to a business expense deduction of $750 in 1966 for legal fees paid for the drafting of an irrevocable family trust?

(4) Did Joseph Staley's promissory note, payable to petitioner C. James Mathews, become worthless in 1966?

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners are husband and wife, and resided in St. Petersburg, Fla., at the time they filed their petition herein. Their joint Federal income tax returns for the years in issue were filed with the district director in Jacksonville, Fla.

### 1. *Rental Deduction*

During each of the years involved, C. James Mathews (herein referred to individually as petitioner) was a funeral director operating Mathews Funeral Home in St. Petersburg, Fla. Prior to November 1,

\*Pursuant to a notice of reassignment sent to counsel for the parties, and to which no objections were filed, this case was reassigned by the Chief Judge on Oct. 16, 1972, from Judge Craig S. Atkins to Judge Cynthia Holcomb Hall for disposition.

1961, petitioners owned the real property on which the Mathews Funeral Home is located. On or about November 1, 1961, petitioners, as grantors, executed four trust instruments, each creating a separate irrevocable trust for one of their four minor children, and transferred to their attorney Richard F. Logan, as trustee of the trusts, four equal undivided interests in the above-mentioned real property. The property was transferred by warranty deed, dated November 1, 1961, which was duly recorded. Each trust provided that it would terminate 10 years and 1 day after execution of the trusts, whereupon the principal of the trust was to be distributed to the grantors or their estates. During the term of the trusts the net income was to be distributed currently to the beneficiary. Petitioner's wife was appointed legal guardian of the four minor children who were the beneficiaries of the four trusts.

During the years in issue the trustee, Richard F. Logan, at all times carried on his fiduciary duties independently of petitioners, for the primary benefit of the trust beneficiaries, and in accordance with the broad powers granted him by the terms of the four trusts. In such capacity he managed the property, collected the rents, paid the expenses, negotiated lease renewals as needed, and paid out the income of the trusts as required by the terms of the trust instruments.

On or about November 1, 1961, the day the trusts were executed, the trustee leased the real property to petitioner who continued to operate the premises as a funeral home. This transaction was prearranged. On February 1, 1963, the trustee and petitioner entered into a new lease of the property for a term of 52 weeks at a total rent of $14,040, payable at the rate of $270 per week. This sum was calculated to produce a profit for the trusts after all expenses. Petitioner was given the option to renew the lease "from year to year upon such terms as shall be mutually agreeable to the parties." This lease, or renewals thereof, was in effect during the years in question. Petitioner paid $14,310, $14,040, and $14,040 as rent for the calendar years 1964, 1965, and 1966, respectively, and deducted these amounts on petitioners' joint Federal income tax returns for those years. The payments were included in the income reported by the four trusts for their fiscal years ending January 31, 1964 through 1967. The rent paid during 1964, 1965, and 1966 was a reasonable rent for the premises.

In order to protect petitioners from possible adverse tax consequences, and because petitioners later became willing and able to relinquish their reversionary interests in the trusts, petitioners executed a subsequent trust agreement on May 23, 1966, whereby they transferred their reversionary interests in the funeral home property to a

new irrevocable trust for the benefit of their four children. The transfer to the 1966 trust was by quitclaim deed dated May 23, 1966, which was duly recorded on June 1, 1966.

Respondent disallowed petitioners' rental deductions for the calendar years 1964 and 1965 and the period January 1 to May 23, 1966, to the extent of $4,740.65, $5,166.43, and $2,042.22, respectively. These amounts were arrived at by deducting from the gross rent paid to the four trusts the taxes, depreciation, interest, and other expenses associated with the funeral home property. Respondent allowed the deduction of rental payments to the trust from and after petitioners' transfer of their reversionary interests to the 1966 trust on May 23, 1966.

### 2. *Entertainment Expenses, Business Gifts, and Club Dues*

Respondent disallowed the following amounts claimed by petitioners as business entertainment expenses and business gifts:

| Year | Amount disallowed |
|---|---|
| 1964 | $2, 468. 64 |
| 1965 | 1, 745. 73 |
| 1966 | 877. 43 |
| Total | 5, 091. 80 |

Disallowance of certain of these expenses has been accepted by petitioners. The expenses still in issue were for alleged business entertainment at the Lakewood Country Club, the St. Petersburg Yacht Club, the Sand Dollar Restaurant, the Port-O-Call Restaurant, the Sheraton Inn, and the petitioners' home, and for certain alleged business gifts given by petitioners.

In addition, respondent disallowed petitioners' claimed deductions for club dues as follows:

| Year | Amount disallowed |
|---|---|
| 1964 | $456. 40 |
| 1965 | 505. 41 |
| 1966 | 463. 50 |
| Total | 1, 425. 31 |

Disallowance of certain of these club dues has been accepted by petitioners. The club dues still in issue were for dues paid to the Lakewood Country Club and the St. Petersburg Yacht Club.

During the years in issue, petitioner deducted as business expenses portions of his monthly bills from the Lakewood Country Club. Petitioner was an active member of the Lakewood Country Club, and during 1964, 1965, and 1966 frequently entertained people there by buying them food and drinks, especially after a golf game. Petitioner kept no contemporaneous or substantially contemporaneous records of the persons he entertained at the club. Petitioner believed that if during any

such entertaining he made a friend or acquaintance aware of the fact he was a funeral director, the expense of entertaining that friend or acquaintance was a deductible business expense. Petitioner's family also used the Lakewood Country Club, and petitioner's wife, like petitioner, frequently played golf. Petitioners deducted the expenses for the activities they believed were business related and did not deduct the expenses for activities they believed were personal and nonbusiness. Petitioners also deducted a portion of the Lakewood Country Club dues.

Petitioner was also a member of the St. Petersburg Yacht Club and he deducted as business expenses a portion of his yacht club bills during the years in issue. One amount was for drinks purchased for a number of petitioner's friends on the occasion of a benefit dinner for the Science Center. Petitioner regarded these friends as a possible source of business. Another amount was for cocktails for friends prior to the annual Black and White Ball. Petitioner usually took the same group of people to the Ball each year. Another amount was for a cocktail and dinner party in 1966 honoring petitioner's wife's birthday which was attended by about 15 friends. Again petitioner kept no substantially contemporaneous record of his entertaining at the St. Petersburg Yacht Club, but he deducted the amount of his total club bills and club dues he believed to be business related.

During the years in issue petitioner often took salesmen (particularly casket salesmen Joseph Staley and Art Christy) to the Sand Dollar for lunch and deducted the cost thereof as a business expense. Petitioner and his guests ate in the businessmen's luncheon room which petitioner regards as quiet and conducive to carrying on business. The salesmen and petitioner would alternate buying each other lunch. Business was generally discussed in some manner or form during these luncheons. Petitioner kept no substantially contemporaneous records of his luncheon expenses at the Sand Dollar. In addition to lunching with salesmen at the Sand Dollar, petitioner ate lunch with the finance committee of his church, and from time to time entertained family and friends there. Petitioner deducted the meals he believed to be business related.

During the period in issue petitioners deducted certain expenses at the Port-O-Call, a restaurant and motel complex in St. Petersburg. Petitioner gave various parties there. In 1964 petitioner gave a party in honor of his wife's birthday. On that occasion petitioner asked a number of friends for cocktails in a private room followed by dinner in the main dining room to the music of Guy Lombardo. Preceding the cocktail and dinner party at the Port-O-Call, petitioner held a cocktail party at his home and deducted its cost as a business expense.

Again no substantially contemporaneous records were kept by petitioner.

On one occasion in 1966 petitioner had dinner with Mrs. C. C. Alexander and Colonel and Mrs. Charles A. Pheffer at the Sheraton Inn Petitioner had buried Mrs. Alexander's late husband and she now wanted the Pheffers to meet petitioner since they "were getting up in years." Petitioner paid for and deducted the entire cost of the dinner The Pheffers are still alive.

From time to time petitioners would entertain guests at their own home. One such event was petitioners' annual New Year's Day party. Between 150 and 200 friends and acquaintances annually attended this party. The primary purpose of the party was to watch the New Year's Day football games, and the secondary purpose was to promote goodwill for petitioner's business. Petitioners would rent two or three television sets and operate them simultaneously throughout their home during the party. Petitioners deducted some of the expenses of the 1966 party as business-related expenses.

Petitioner purchased a case of Tanqueray gin in January 1964. He gave away bottles of the gin in order to promote his business. He gave one bottle each to a Mr. Angle and a Mr. Stephenson, both of whom are personal friends. He has no record and cannot remember to whom he gave the other bottles. Petitioners deducted the entire cost of the case of gin as business gifts.

### 3. *Legal Fees*

In 1966 petitioners paid their attorney $750 for legal services rendered in connection with the establishment of the May 23, 1966, irrevocable trust for the benefit of their children, to which they transferred their reversionary interest in the funeral home property. In his statement, the attorney described the services rendered, without allocation, as "Research for, conferences concerning, and drafting of Irrevocable Family Trust Agreement." Petitioners deducted the $750 as a business expense on their 1966 income tax return. Respondent disallowed the deduction on the grounds the expense was personal in nature.

### 4. *Worthless Note*

On September 16, 1966, petitioner loaned Joseph Staley $2,500, and in exchange received Staley's $2,500 demand note bearing interest at 6 percent per annum. Petitioner did not ask Staley to repay the loan during 1966 because he did not believe Staley could pay it.

During 1966 Staley's assets consisted of his home and stock in a corporation. In 1967 the corporation purchased his stock for a note payable

at the rate of $520 a month for 20 years. Staley intended to repay his $2,500 note and had a reasonable prospect of doing so as of the end of 1966.

Petitioners deducted the loan as a nonbusiness bad debt on their 1966 income tax return.

## 1. *Rental Deduction*

Petitioners contend that payments made to the four trusts are ordinary and necessary business expenses in the nature of rent deductible pursuant to section 162(a)(3).[1] However, respondent contends that such payments are not deductible, principally because petitioners are said to have retained a disqualifying interest in the property. We agree with petitioners.

The question whether a taxpayer, who has transferred to a trust property previously owned by him and used in his trade or business, may lease this property from the trust and deduct his rental payments pursuant to section 162(a)(3) has been considered by the courts on numerous occasions.

Under the cases, it is common ground that rent paid by a grantor to a trustee in such a gift and leaseback is deductible under section 162(a)(3) only if the following requirements are met:

(1) The grantor must not retain "substantially the same control over the property that he had before" he made the gift. *Sidney W. Penn*, 51 T.C. 144, 150 (1968). This requirement is usually met through a transfer to an independent trustee who has the right and the opportunity to negotiate regarding the leaseback and who acts for the primary benefit of the trust beneficiaries, rather than the grantor. *Van Zandt* v. *Commissioner*, 341 F. 2d 440 (C.A. 5, 1965), affirming 40 T.C. 824 (1963), certiorari denied 382 U.S. 814 (1965); *Brown* v. *Commissioner*, 180 F. 2d 926 (C. A. 3, 1950), reversing 12 T.C. 1095 (1949), certiorari denied 340 U.S. 814 (1950); *Skemp* v. *Commissioner*, 168 F. 2d 598 (C.A. 7, 1948), reversing 8 T.C. 415 (1947).

(2) The leaseback should normally be in writing[2] and must require payment of a reasonable rental. *Sidney W. Penn, supra* at 152–153.

---

[1] All Code references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

Sec. 162(a)(3) provides:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \* \* \*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

[2] But see *Brooke* v. *United States,* 468 F. 2d 1155 (C.A. 9, 1972).

(3) The leaseback (as distinguished from the gift) must have a bona fide business purpose. *Alden B. Oakes*, 44 T.C. 524 (1965).

We find that these requirements are met.

First, the trustee, we have found as a fact, acted independently of the petitioners-grantors under broad powers specifically set forth in the four trust agreements. See *Brown* v. *Commissioner, supra; Alden B. Oakes, supra; Albert T. Felix*, 21 T.C. 794 (1954). As such trustee, he entered into a 1-year written lease of the property which was renewable annually *only* if mutually agreeable terms could be reached by the trustee and petitioner. The years here in issue were renewal periods. The trustee collected rents due under the lease, paid the trusts' expenses, negotiated renewals with the grantor as required, and distributed the net income for the benefit of the minor beneficiaries or directly to their legal guardian. In this respect the case must be distinguished from cases such as *Van Zandt* v. *Commissioner, supra*, relied on by respondent, in which lack of independence in the trustee was deduced not only from the fact that the grantor named himself as trustee but also from the fact that the lease transaction was pre-arranged at the inception of the trust, apparently for the entire 10-year term of the trust. In *Van Zandt*, the trustee had little or no room, therefore, for the exercise of independent discretion and had little to do in his fiduciary capacity but collect the prearranged rentals. The grantor thus failed to relinquish effective control over the property and was not permitted to deduct rentals paid therefor.

Secondly, the lease in question was in writing, and we have found as a fact that the rent paid by petitioners to the trusts was a reasonable rent for the property. See *Alden B. Oakes, supra; Albert T. Felix, supra*.

Third, there was demonstrated business purpose for the lease. The rent was clearly both ordinary and necessary and was required to be paid as a condition to continued use of the property. "[W]e think that where, as here, a grantor gives business property to a valid irrevocable trust over which he retains no control and then leases it back, it is not necessary for us to inquire as to whether there was a business reason for making the gift. Admittedly there was none. Under such circumstances the test of business necessity should be made by viewing the situation as it exists after the gift is made." *Alden B. Oakes, supra* at 532; *Brooke* v. *United States*, 468 F. 2d 1155 (C.A. 9, 1972). Here petitioner needed the building to carry on his funeral business and agreed to rent the property from the trustee for a reasonable rent.

But, respondent argues, all of the above points are immaterial because petitioners had a disqualifying *equity* in the property, in the

form of a reversionary interest, and under the plain words of the statute a taxpayer can deduct rent only if paid for "property to which the taxpayer has not taken or is not taking title or in which he has no *equity*." [3] (Emphasis added.) The question is whether petitioner's ownership of a reversionary interest constituted an "equity" in the rental "property" within the meaning of section 162(a)(3). The statutory phrase is singularly opaque, and on its face could be susceptible to a number of different meanings. Reading the language at its broadest, the term "property" could mean the fee simple absolute title to the parcel of real estate in question, and the term "equity" could mean any beneficial share (beyond the leasehold interest itself) in the bundle of rights making up such title. If this construction were correct, respondent would prevail, for petitioner concededly held a reversionary interest in the funeral home property, to become possessory upon expiration of the term of years held by the trust. On the other hand, in the context of section 162, it is at least equally permissible to contend that the "property" in which petitioner may not take title or have an equity is, for this purpose, limited to the particular bundle of property rights owned by the lessor at the inception of the lease and forming the subject matter of the lease. Under the latter construction, petitioner would prevail, for the only property owned by the lessor-trusts was the term of years which constituted the trusts corpus, petitioner at no time owned part of the trusts' corpus, and the trusts at no relevant time owned or leased to petitioner any part of petitioner's reversion. In the construction of section 162(a)(3), we are unassisted by any legislative history explaining the phrase,[4] or by any prior holdings of this Court considering it in the present context of a lessee's ownership of a reversionary interest to become possessory at or after the expiration of the lease. In the absence of any guidance from legislative history or well-reasoned earlier case law, we must reach the best answer we can in light of the application of common-sense to the general structure and purpose of the Internal Revenue Code, and specifically, section 162.

Most of the cases dealing with this particular phrase of section 162(a)(3) concern whether a purported lease of property is in actuality a sale, so that the so-called "rental" payment secured for the

---

[3] The funeral home property appears to have been subject to a mortgage, but the record does not disclose whether the trusts or the grantors were making principal payments (if any) on the mortgage note. Since respondent does not contend that any "equity" was being built up out of rentals through this mechanism, but relies solely on petitioners' retention of the reversion, we need not speculate on what would be the effect on rental deductions under sec. 162(a)(3) of mortgage principal payments by a trust.

[4] The phrase came into the statute in 1916, sec. 12(a) (1st) of the Revenue Act of 1916, Pub. L. No. 271, 64th Cong., 1st Sess.

"lessee" not only the right to use and possession during the lease term, but in addition an ownership interest, or equity, in the "leased" property. Purported rentals which are a disguised purchase price of a "lessor's" property rights must be capitalized rather than deducted. *Benton* v. *Commissioner*, 197 F. 2d 745 (C.A. 5, 1952) ; *M & W Gear Co.*, 54 T.C. 385 (1970), modified by 446 F. 2d 841 (C.A. 7, 1971) ; *Earl L. Lester*, 32 T.C. 711 (1959) ; *Chicago Stoker Corp.*, 14 T.C. 441 (1950) ; *Judson Mills*, 11 T.C. 25 (1948). See Rev. Rul. 55–540, 1955–2 C.B. 39; 4A Mertens, Law of Federal Income Taxation, sec. 25.108. Such use of section 162(a)(3) is unexceptionable on any interpretation. The transaction is in fact a purchase, and rather than deducting the payments currently as rentals, the lessee must add them to his basis and may thereafter obtain tax recognition of them in the prescribed manner, normally under either section 167 (by depreciation) or section 1001(a) (in determining the amount of gain or loss on disposition).

It is equally clear that where the purported property of the lessor for tax purposes is treated as owned by the lessee because of an ineffectual gift, as to a nonindependent trustee, the requirements of section 162(a)(3) have not been met. In such case, the lessee has an equity in the property in the form of effective ownership. E.g., *Van Zandt* v. *Commissioner*, supra; *Sidney W. Penn*, supra.

But respondent would give the phrase in question a much broader meaning. He contends that even if the rental payments in question secured for the lessee nothing more than the use or possession of property during the limited period to which the payments relate, the payments are nevertheless not deductible if the lessee happens to own property rights in the same asset, albeit not derived from the lessor's rights, and not scheduled to become possessory until a later period. Thus, contends respondent, the disqualifying "equity in the property" as used in section 162(a)(3) includes a reversionary interest owned at all times by the lessee and not acquired from the lessor through the lease.

At the outset, we note that if the term "equity," as respondent appears to contend, is claimed to include any rights in an asset which could be enforced by a court of equity, respondent proves too much. Any lessee has such rights, including a right to specific performance of the terms of the lease. See, e.g., *Crossman* v. *Fontainebleau Hotel Corp.*, 273 F. 2d 720 (C.A. 5, 1959) ; *Thurman* v. *Trin*, 199 Kan. 679, 433 P. 2d 367 (1967) ; *Pedrick* v. *Vidal*, 95 Fla. 952, 116 So. 857 (1928). No rentals would ever be deductible under this construction. Thus it is at least clear that "equity" has a narrower meaning. The issue is whether that narrower meaning is still broad enough to cover

a lessee's ownership rights in an asset held concurrently with, but not derived from, the lessor's property rights or enlarged through the rental payments. If, for example, a lessee was at all times the owner of a 50-percent undivided interest in a parcel of land, would he be precluded by section 162(a)(3) from deducting the rental paid to his coowner for the use of the latter's rights? In answer to this question, we must of course set aside the particular facts of the present case, with its overtones of careful tax planning, for if the term "equity" has in the present context the broad meaning for which respondent argues, it must have the same meaning where no tax plan is involved.

We gain some help from the language of the statute. The language "property to which the taxpayer *has not taken or is not taking* title" (emphasis added) appears clearly enough to indicate that Congress had in mind an ongoing process in which the taxpayer *takes* (not "has") title to the property, evidently from the lessor through the purported rental payments. It is difficult to read into this language a prohibition on preexisting ownership of property rights in the asset other than those *owned or purportedly owned by the lessor and the subject of the lease.* We note, furthermore, that the disjunctive "or" rather than the conjunctive "and" is used after the phrase "the taxpayer has not taken or is not taking title." Literally, the rent would therefore pass muster if the taxpayer "has not taken or is not taking title" without regard to whether he has an "equity"; and even if title is taken, the rental for the property would still not be rendered nondeductible by the "taking title" language unless the taxpayer has an equity.[5] Whether or not this reading is warranted, however, the disjunctive at the least seems to render it clearer that Congress intended the "or" clause to be read in conjunction with the preceding language. This would suggest that the kind of "equity" in the "property" referred to must be one "taken" (from the lessor), or at least overlapping a purported ownership interest of the lessor.

The statutory language, however, is so murky that it is too frail a reed to lean on alone. While it appears from the foregoing that Congress probably intended to disqualify an equity *taken* (from the lessor) rather than a preexisting ownership interest not derived from or enlarged under the lease, the language literally refers to the taxpayer *having* rather than *taking* an equity, and the disjunctive "or" may have been an oversight. We rest our conclusion therefore primarily on the fact that respondent's construction would produce such anomalous and unfair tax results in the present context that we cannot hold that Congress could have intended such construction without com-

---

[5] Without adverting to the literally disjunctive phraseology, *Oesterreich v. Commissioner*, 226 F. 2d 798 (C.A. 9, 1955), reads the requirements of the statute in the conjunctive.

pelling evidence that this was its intent. Where respondent applies section 162(a)(3) to a purported lease which is really a sale, no injustice is done. The payment in such case enlarges the taxpayer's ownership rights and may in due course be recovered taxwise. But here, the rental payments did not enlarge petitioner's ownership. They were clearly ordinary and necessary business expenses attributable to the years in issue. If they are nondeductible, they may not be capitalized. They purchase nothing of value beyond the years in issue. They will simply be lost. Therefore, the effect of respondent's argument is to require a systematic overstatement of petitioner's net income for each year in which a part of the bona fide and necessary cost of earning that income was the rental payment in question. We are therefore of the view that section 162(a)(3) should not be read to cause rental payments to become nondeductible merely by virtue of a lessee's property rights in an asset, which rights are not derived from the lessor or under the lease, and which will become possessory only after the lease expires.

Under respondent's interpretation, the owner of a reversion to become possessory only after a 99-year lease would apparently be precluded from deducting bona fide rentals paid for a 10-year sublease. Anybody else entering into such a sublease could surely deduct his rental payments, and we see no good reason to attribute to the Congress the desire to distort the measurement of income by prohibiting such a deduction to the reversioner alone. Likewise, respondent's interpretation would seem to bar the owner of an undivided interest in an asset from leasing the remaining interests from his coowners, and this for no good reason which has been pointed out to us. In order to avoid ascribing to the Congress so capricious a limitation on the rental deduction, we hold that the property in which the taxpayer should have no equity does not include a reversionary interest, not derived from the lease or from the lessor, which is scheduled to become possessory after the expiration of a lessor's term of years.

This approach to section 162(a)(3) is consonant with the holding of *Abramson* v. *United States*, 133 F. Supp. 677 (S.D. Iowa 1955). In that case, certain rental payments under a lease were applied or credited on the lessee's purchase price of certain items, but other rental payments, not included in the purchase price, and therefore not going to build an "equity," were allowed as deductions. Under the sensible *Abramson* approach, section 162(a)(3) prohibits the current deduction of a capitalizable item; it does not operate so as to prevent a taxpayer from deducting rental payments in circumstances where the payments are *not* appropriate additions to a basis account. In this regard, to the extent they may be inconsistent with the views expressed

24

herein, we disagree with *Gibbons* v. *United States*, an unreported case (D. N.Mex 1970, 25 A.F.T.R. 2d 70–1332, 70–1 U.S.T.C. par. 9365), and the alternative holding in *Hall* v. *United States*, 208 F. Supp. 584 (N.D. N.Y. 1962).

In *Alden B. Oakes, supra,* this Court did not have to decide whether the mere retention of a reversionary interest in the property constituted a disqualifying equity interest, because the Court there found that the taxpayer "had no 'equity' in the property after [he relinquished his reversionary interest] and during most of the time covered by the years in issue." 44 T.C. at 531.[6]

Finally, respondent contends that under our decision in *Jack E. Golsen,* 54 T.C. 742 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971), we are required by decisions of the Court of Appeals for the Fifth Circuit, to which appeal herein will lie, to disallow the rental deduction here. We disagree with respondent's reading of these cases. In *Chace* v. *United States,* 303 F. Supp. 513 (M.D. Fla. 1969), affirmed per curiam 422 F. 2d 292 (C.A. 5, 1970), the District Court for the Middle District of Florida held that the grantor-lessee in that case was not entitled to a rental deduction, finding that the facts in *Chace* were almost identical with the facts in *Van Zandt* v. *Commissioner, supra,* and that *Chace* clearly fell within the holding of *Van Zandt.* The Fifth Circuit, in affirming Chace per curiam, cited *Furman* v. *Commissioner,* 381 F. 2d 22 (C.A. 5, 1967), affirming per curiam 45 T.C. 360 (1966), and *Van Zandt.* The facts in the instant case are clearly distinguishable from the facts in *Chace, Furman,* and *Van Zandt,* most notably in our crucial finding that the trustee in the instant case is independent. *Chace* also held, in an alternative holding, that the taxpayer retained a disqualifying equity in the property, apparently relying primarily on the fact that the grantor-lessee had the right under the lease agreement to renew the initial 3-year term of the lease for three additional periods of 3 years at the same rental as the original term, the options to renew exceeding the term of the 10-year trust. This circumstance, of course, left the trustee with no real opportunity to exercise genuine control over the property. This was (we think properly) construed by the court in *Chace* as inconsistent with the genuine relinquishment of control to an independent trustee which has been held to be required for deduction of rentals after a gift and lease-back. Clearly the alternative holding does not stand for the proposi-

---

[6] Moreover, in *Irvine K. Furman,* 45 T.C. 360, 366 (1966), affirmed per curiam 381 F. 2d 22 (C.A. 5, 1967), the Court specifically expressed no opinion on this issue. See also *Sidney W. Penn,* 51 T.C. 144, 154 (1968), where this Court held that under the facts of that case the release of the reversionary interest did not thereafter entitle the taxpayers to deduct thier rental payments because taxpayers' "dominion and control over the trust property was not significantly diminished by the conveyance of their reversionary interests."

tion that a reversionary interest, standing by itself, is a disqualifying equity in the property, as the respondent contends in the instant case. Because *Chace*, which was affirmed by the Fifth Circuit, is not in point with respect to the issue we must decide and is distinguishable on its facts, our decision in *Jack E. Golsen, supra*, does not require a decision against petitioners on this issue. *Estate of George I. Speer*, 57 T.C. 804, 812 (1972) ; *Wayman A. Collins*, 56 T.C. 1074, 1078 (1971) ; *Motel Corp.*, 54 T.C. 1433, 1439 (1970).

## 2. *Entertainment Expenses, Business Gifts, and Club Dues*

Petitioners contend they are entitled to deduct the entertainment expenses, costs of business gifts, and club dues in issue as ordinary and necessary business expenses within the meaning of section 162, and, further, that they have met the substantiation and other requirements of section 274. Respondent asserts that petitioners have failed to show that such expenditures meet the requirements of either section 162 or section 274. We hold that regardless of whether petitioners' entertainment expenses, costs of business gifts, or club dues constituted ordinary and necessary business expenses deductible under section 162, petitioners have failed to substantiate those expenses by adequate records or other sufficient evidence, and that therefore these expenses are disallowed pursuant to section 274(d) and the regulations thereunder.

Section 274(d) provides that entertainment expenses and the expense of gifts and club dues are not allowable as deductions "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense * * *, (B) the time and place of the * * * entertainment, * * * or use of the [club], or the date and description of the gift, (C) the business purpose of the expense * * *, and (D) the business relationship to the taxpayer of persons entertained, using the [club], or receiving the gift."

The regulations (section 1.274–5(c)) provide that "adequate records" consist of an account book or diary or similar record in which the elements of the expenditures are recorded at or near the time of the expenditure. In this case petitioner admits that he cannot meet the adequate records requirement of the statute and regulations since he maintained no contemporaneous diary of the entertainment expenses or gifts or of the use of the clubs. The question, therefore, is whether he has substantiated the expenses by sufficient evidence corroborating his oral testimony. The regulations (section 1.274–5(c) (3)) require such substantiation by a written statement containing detailed information on each element,[7] and other corroborative evi-

---

[7] The elements in the case of entertainment expenses are the amount, time, place, business purpose, and business relationship of those entertained ; and in the case of a gift the amount, time, description of the gift, business purpose, and business relationship of the recipient.

dence sufficient to establish such elements. The type of corroborative evidence required is (1) the testimony of the person entertained or the recipient of the gift, or of other witnesses, setting forth detailed evidence of the elements, or (2) documentary evidence proving such elements. However, circumstantial evidence may be used to establish the business purpose or the business relationship.

The Second Circuit has held that the taxpayer's detailed statement need not be in writing, and that the portion of the regulations requiring a written statement is invalid. *LaForge* v. *Commissioner*, 434 F. 2d 370 (C.A. 2, 1970), reversing on this issue 53 T.C. 41 (1969). In other words, the taxpayer's oral testimony, properly corroborated, is sufficient to establish the section 274 elements of business entertainment expenses or the expense of business gifts. Both the Second Circuit and the Tax Court have strictly interpreted the *LaForge* case in determining what is sufficient corroboration of the taxpayer's oral testimony as to the amount, time, place, and business purpose of the expenditures. *Hughes* v. *Commissioner*, 451 F. 2d 975 (C.A. 2, 1971), affirming a Memorandum Opinion of this Court; *Norman E. Kennelly*, 56 T.C. 936 (1971), affirmed in open court without opinion 456 F. 2d 1335 (C.A. 2, 1972).

In this case, petitioner went back over his bills, receipts, and canceled checks after the Commissioner commenced his audit of the years in issue and tried to the best of his recollection to separate personal expenses from business expenses. These bills, receipts, and canceled checks have no notations as to the amount of the business expense, the business purpose of the entertainment or gift, or the business relationship of petitioners to the recipients of the entertainment or gifts. Petitioner's memory is vague and unspecific, and his testimony was unconvincing. The *only* elements established by the bills, receipts, and canceled checks are the time, place, and amount of *both* the personal and business expenditures of petitioners at various restaurants and clubs, and not the business portion thereof. Moreover, petitioners have failed to substantiate the business purpose of the various claimed expenditures or the business relationships of the parties by documentary or circumstantial evidence.

The testimony of the Lakewood Country Club golf professional and bartender added nothing except to establish that petitioners were at the club often. The witnesses were not in a position to nor did they establish the business purpose or business relationships of any of the entertaining petitioners did at the club.

We find that there has not been sufficient corroboration of taxpayer's oral testimony to meet the requirements of section 274(d) with regard

to the business entertainment expenses or cost of the business gifts in issue in this case.

In order to be able to deduct any part of the club dues paid to the Lakewood Country Club and the St. Petersburg Yacht Club, petitioners must establish that the clubs were used "primarily for the furtherance of the taxpayer's trade or business." Sec. 274(a)(1)(B) and (2)(A). Petitioners are required to maintain records of the use of a club to establish that its primary use was business related rather than personal. "If a taxpayer fails to maintain adequate records concerning a [club] which is likely to serve the personal purposes of the taxpayer, it shall be presumed that the use of such [club] was primarily personal." Sec. 1.274-5(c)(6)(iii), Income Tax Regs.

Petitioners have failed to carry their burden of proof that the clubs were used primarily for business purposes, and therefore no part of the dues for either club is deductible.

### 3. *Legal Fees*

Petitioners contend the $750 in legal fees paid in connection with establishing the 1966 irrevocable family trust is a deductible business expense. Respondent contends it was a nondeductible personal expense, and we agree.

We hold that the primary purpose in establishing the 1966 trust was to make a gift in trust of the petitioners' reversionary interest in the funeral home property to their children. As such, the legal fees paid petitioners' lawyer to establish the trust were a nondeductible personal expense.

### 4. *Worthless Note*

Petitioner contends that his loan to Staley, evidenced by a demand note, became worthless in 1966. Respondent asserts that petitioners have failed to prove that the loan became worthless in 1966, and we agree.

Petitioner claimed the $2,500 note became worthless within 3½ months after it was created, but petitioner, on whom the burden of proof rests, has failed to prove that the debt both (1) was not worthless when created on September 16, 1966 (*Russell Box Co.* v. *Commissioner*, 208 F. 2d 452, 455–456 (C.A. 1, 1953), affirming a Memorandum Opinion of this Court), and (2) became worthless before the end of 1966 (section 166(d)(1)(B)). Petitioner has failed to carry his burden of proof with respect to this issue.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

QUEALY, *J.*, dissenting: In this case, the petitioner admittedly had an equity in the property which he was renting. He owned the property in fee and had merely granted to the trust a term of years, giving the trust no greater interest than that of a lessee. Section 162(a) specifically limits the deduction for rentals to property "in which he [petitioner] has no equity." Regardless of what may have been the intention of the Congress, and I find it difficult to believe that there was any intent to legitimatize this form of transaction, I find no justification for disregarding the clear language of the statute. Accordingly, I believe that the position of the respondent on this issue should be sustained.