HARRY R. FAWCETT and SUSAN E. FAWCETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fawcett v. Commissioner
Docket No. 4462-71.
United States Tax Court
T.C. Memo 1975-271; 1975 Tax Ct. Memo LEXIS 102; 34 T.C.M. (CCH) 1164; T.C.M. (RIA) 750271; August 26, 1975, Filed Harry R. Fawcett and Susan E. Fawcett, pro se. Thomas L. Kummer, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $68,448.75 in the petitioners' income tax for 1967 and an addition to tax under section 6653(a) [1] in the amount of $3,422.44. Following concessions by the parties, the issues to be decided are: (1) Whether $126,060.00 deposited to petitioners' bank account during 1967 constituted unreported gross income; (2) Whether petitioners may deduct $1,898.67 in travel and entertainment expenses; (3) Whether all or part of the underpayment in tax was due to negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners are husband and wife, residing in Kokomo, Indiana. They filed a joint Federal income tax return for 1967, showing gross income *104 of $13,218.67 and no tax liability. [2]
1. Bank Deposits
Respondent determined that the following amounts deposited to petitioner's personal checking account [3] constituted income omitted from the 1967 joint return: Date
Amount
1-6-67
$ 25,000
1-19-67
25,000
2-8-67
25,000
3-8-67
40,000
6-7-67
1,000
8-26-67
4,560
9-5-67
1,000
11-20-67
4,000
12-6-67
500
$126,060
A. The January 6 and January 19 deposits
During or prior to 1966, petitioner had various dealings with one George Manuel, who was engaged in locating and securing mortgage financing for real estate ventures. Manuel had also been in the construction business in Dayton, Ohio. In 1966, he was approached by James Herbert, president of the Lorain National Bank (hereinafter the Lorain Bank) in Lorain, Ohio. Herbert was seeking *105 $600,000 to $800,000 in financing in order to complete a construction project (hereinafter "Chateau L'Aiglon"), with which the bank was involved, in Dayton. Herbert offered Manuel a finder's fee of $50,000 if a commitment for the needed financing could be obtained. [4]
Manuel discussed this project with petitioner. Petitioner informed him that the financing could be obtained from two Indiana business trusts, the Republic National Trust and the American National Trust (hereinafter Republic, American, or the trusts), but only if petitioner became a trustee of the trusts. The only way for petitioner to become trustee of the trusts was for him to purchase the interests of the existing trustees. [5] Herbert agreed to loan Fawcett and Manuel $200,000 to cover the cost of acquiring stock and of start-up expenses. Manuel was to have the direct supervision of the construction project. Herbert asked that Manuel obtain the signature of Meyer Goldberg, a Cincinnati businessman to whom Manuel had referred during negotiations, on a note for the $200,000. When approached by Manuel, however, Goldberg refused to sign. Manuel thereupon *106 signed Goldberg's name to the note, individually and as president of Industrial Investments Corporation. Manuel signed his own name individually and as vice president of Industrial Investments; [6] petitioner signed the note individually. The note (sometimes referred to as the Goldberg note) was dated January 16, 1967. [7]
Herbert was anxious to see the Chateau L'Aiglon project proceed quickly. He provided Manuel with unnumbered blank checks for an account (hereinafter the "joint account") at the Lorain Bank which was opened in the names of petitioner and Manuel jointly. On January 5, 1967, Manuel and petitioner wrote the following unnumbered checks on the joint account: Payee
Amount
Monticello Resources Corp.
$25,000
Monticello Resources Corp.
25,000
Life Mergers of America
50,000
Frank L. Gregory
25,000
Cash
25,000
Cash
25,000
*107 On or about January 6, 1967, petitioner became a trustee and president of Republic and American. The first three checks listed above were never debited to the account. The check payable to Frank L. Gregory was deposited by him to an account at the Peru Trust Company, Peru, Indiana, and debited to the joint account on January 16, 1967. One of the checks payable to cash was deposited by petitioner to the personal account, which was credited on January 6, 1967. Both checks payable to cash were debited to the joint account on January 16, 1967. On that date, $75,005 [8] was advanced against the Goldberg note by the Lorain Bank and deposited in the joint account for the purpose of covering the three $25,000 checks. On January 16, 1967, an unnumbered check for $25,000, payable to petitioner, was drawn by Manuel on the joint account. Petitioner deposited this check to the personal account on January 19, 1967. The joint account was debited for this check on January 26, 1967. Another check in the amount of $25,000, not identified in the record, was charged against the joint account on January 26, 1967. [9] *108 Both checks were covered by an additional $50,000 advance against the Goldberg note on January 26, 1967, bringing the total of advances to $125,005. B. The February 8 deposit
On January 23, 1967, an unnumbered check in the amount of $25,000 was drawn on the joint account by Manuel, payable to petitioner. On January 27, petitioner delivered that check to the Peru Trust Company but the deposit slip is dated February 8, 1967 and it was credited to the personal account on that date. The check was covered by an advice of the Lorain Bank, dated January 30, 1967, that it would be honored, and was paid by that bank by a cashier's check dated February 6, 1967, but was never debited to the joint account. Meanwhile, on January 24, 1967, petitioner and Manuel personally *109 executed a new note, at Herbert's insistence, to replace the Goldberg note. The new note was in the amount of $125,000, [10] and that entire amount was advanced on January 26 to pay off the outstanding balance on the Goldberg note. The new note was collateralized by a time certificate of deposit number C579, which was an asset of Republic. Interest on the "new" loan was paid on March 21, August 28, and December 18, 1967, and the loan was paid off on March 6, 1968, by means of a further loan. On February 2, 1967, an amount of $116.67, representing interest to January 24, 1967, was paid on the liability represented by the debits of $75,000 to the joint account on January 16, 1967. [11]
On February 6, 1967, petitioner obtained a loan from the Lorain Bank in *110 the amount of $25,000. This loan was collateralized by time certificate of deposit number C580, which was also an asset of Republic. [12] The proceeds of this loan were not deposited to any bank account involved in this case. C. The March 8 deposit
On February 13, 1967, an unsecured note in the face amount of $300,000 was executed by the trusts in favor of the Lorain Bank. The note was signed by petitioner as president of the trusts and by Frank L. Gregory as secretary. A draw of $288,000 was made against this note immediately and forwarded to the Winters National Bank in Dayton. These funds were used for construction of Chateau L'Aiglon. No further draw was made on this note during 1967. On February 17, 1967, petitioner and Frank L. Gregory drew a check in the amount of $85,000 on Republic's account at the American Fletcher National Bank and Trust Company in Indianapolis (hereinafter the Fletcher Bank) and sent it to the Lorain Bank for *111 the purpose of opening a general commercial account in the name of Chateau L'Aiglon. The check was originally deposited as directed on February 27, 1967; however, it was subsequently returned for lack of proper signatures. It was replaced by 17 checks in the amount of $5,000 each, drawn on Republic's Fletcher Bank account. These checks were signed by petitioner alone and credited to the Chateau L'Aiglon account on March 3, 1967. On March 3, 1967, petitioner drew two checks in the amount of $100,000 each, one on American's account at Merchants National Bank & Trust Company of Indianapolis (hereinafter the Merchants Bank) and the other on Republic's Fletcher Bank account. Both checks were deposited to the Chateau L'Aiglon account and were credited on March 6, 1967. The only items credited to the Chateau L'Aiglon account prior to March 6, 1967, were the returned $85,000 check (which credit was reversed), the 17 $5,000 checks, and the two $100,000 checks. On February 24, 1967, an unnumbered check in the amount of $40,000 signed by Manuel and payable to Peru Trust Company was drawn on the Chateau L'Aiglon account. This check was deposited to petitioner's personal account. It was honored *112 by the Lorain Bank by a cashier's check, for which the Chateau L'Aiglon account was debited on March 6, 1967. The personal account was credited on March 8, 1967. D. The June 7 deposit
On November 22, 1966, petitioner wrote a check in the amount of $1,500 on the personal account, payable to Manuel. On March 1, 1967, an unnumbered check in the amount of $200,000 was drawn by Manuel on the Chateau L'Aiglon account, payable to Peru Trust Company. This check was deposited to an account in the name of Publishing Associates, on which the only authorized signature was Frank L. Gregory. It was charged to the Chateau L'Aiglon account on March 14, 1967, and credited to the Publishing Associates account on March 16, 1967. On March 21, 1967, $25,000 was transferred from the Publishing Associates account to Manuel's personal account at the Peru Trust Company. On June 5, 1967, Manuel drew a check on his personal account in the amount of $1,000 payable to petitioner, which was deposited to petitioner's personal account and credited on June 7, 1967. The personal account shows deposits, each in the amount of $1,000, on February 21 and May 12, 1967, for which respondent has not charged petitioners *113 herein. E. The August 26 deposit
The trusts issued a mortgage commitment dated June 1, 1967, to one John Key of Belton, Missouri, pertaining to a property known as Key Apartments. The commitment provided for a fee of $13,680, of which $4,560 was to be paid on acceptance of the terms and the balance of $9,120 on settlement of the interim financing. On June 1, 1967, Republic received $4,560 from John Key and credited it to a commitment fee account. On August 25, 1967, several events occurred: (1) American received $27,360 with respect to this commitment, which it credited to a commitment fee account with the notation, "Missouri Realty--Key Apts." (2) American deposited $27,360 to its Merchants Bank account, consisting of two items, one of $18,240 and one of $9,120. The $9,120 item was a bank money order concerning the Key commitment and payable to the trusts. (3) Petitioner drew a check in the amount of $18,240 on American's Merchants Bank account, payable to Merchants Bank. (4) American entered on its books a cash disbursement of $18,240, which was debited to an account relating to Woods and Lakes, a Florida real estate venture. (5) Merchants Bank issued a cashier's check in *114 the amount of $4,560 payable to petitioner, indicating Missouri Realty & Investment Co. as remitter. This cashier's check was deposited and credited to petitioner's personal account on August 26, 1967. F. The September 5 and November 20 deposits
Petitioner deposited $1,000 and $4,000 to his personal account on September 5 and November 20, 1967, respectively. These amounts constituted salary paid to petitioner by the trusts. Such salary was not reported on the Form W-2 provided to petitioner by the trusts and was not included in the income reported on the joint return. G. The December 6 deposit
On December 1, 1967, a check in the amount of $500 was drawn by Manuel payable to petitioner on an account of the Keystone Mortgage Co. at the Indiana National Bank, Indianapolis, Indiana. This check was deposited and credited to petitioner's personal account on December 6, 1967. 2. Travel and Entertainment Expense
Petitioner incurred various travel and entertainment expenses during 1967, the amounts of which are stipulated. ULTIMATE FINDINGS OF FACT 1. Petitioners received unreported gross income of $76,060 during 1967. 2. Petitioners have not substantiated any *115 deduction for travel and entertainment expense in 1967 in excess of the amount allowed by respondent. 3. At least a part of petitioners' underpayment of tax for 1967 was due to negligence or intentional disregard of rules and regulations. OPINION 1. Unexplained Bank Deposits
Our analysis has been complicated by the fact that, in large measure, petitioner both at the trial and on brief dealt in generalities and failed to come to grips with the details of the particular transactions involved, arguing that he was victimized both by respondent and other persons who participated or were interested in the various dealings in which petitioner was involved and in the ensuing litigation arising out of the non-tax aspects, including assertions that such victimization was rooted in political considerations. Needless to say, such arguments scarcely have any bearing on the issues we are called upon to decide, whatever our sympathies may be in regard to petitioner's claims. Fortunately, we had the benefit of a comprehensive stipulation of facts and supplementary documents submitted at the trial, so that, with relatively minor exceptions, we have been able to dispose of those issues on *116 the written record. [13]
Respondent determined that $126,060 deposited from time to time in petitioner's personal checking account, as set forth in our findings, constituted unreported income. Petitioner has offered various explanations which, he contends, establish that he is not taxable on any of these amounts. [14] The issue is factual, and petitioner has the burden of proof. C.B.C. Super Markets, Inc.,54 T.C. 882, 891 (1970); Albert Gemma,46 T.C. 821, 833 (1966). As to certain of the items, the focus of our inquiry is limited to the question of tracing those items to funds which petitioner concededly borrowed from the Lorain Bank. Although the record indicates the possibility that the source of some of these deposits might have been funds misappropriated from the trusts, the case was not tried in that frame of reference and we therefore do *117 not consider such issue properly before us. A. The January 6 and January 19 deposits
Petitioner deposited $25,000 to the personal account on January 6, 1967 and again on January 19, 1967. He claims that both deposits originated in borrowings from the Lorain Bank, and thus did not represent taxable income. It seems clear that, no later than January 5, 1967, petitioner and Manuel had received a commitment from the Lorain Bank to loan them the funds necessary to obtain control of the trusts. They were able to draw checks on a joint account opened in their names at the bank, although no deposits were made to that account until the same day those checks were honored. The personal credit of petitioner and Manuel was inadequate to justify an unsecured loan of the size they needed; when Goldberg refused to act as an accommodation maker, Manuel signed Goldberg's name. Since Herbert was willing to advance sizable amounts as early as January 5, it is possible *118 to conclude that the Goldberg note was in existence at that time and that its January 16 date was inserted at the time of the first actual advance. However, as we previously pointed out (see footnote 7, supra), we consider it immaterial for the purposes of this case whether the note was in existence prior to the latter date. The January 5 check which was deposited to petitioner's personal account on January 6 was not paid by the Lorain Bank and charged to the joint account until January 16. It is, therefore, traceable to the advances made by the bank. A similar conclusion follows as to the check drawn on January 16 and credited to petitioner's personal account on January 19, which was paid by the Lorain Bank and charged to the joint account on January 26. In short, as our findings of fact show, petitioner borrowed funds from the Lorain Bank, on which interest and principal were subsequently paid, and the two deposits in question can be identified as coming from those funds. We therefore hold that the January 6 and 19 deposits do not constitute taxable income to petitioners. [15]
*119 B. The February 8 deposit
On February 8, 1967, petitioner's personal account was credited with a $25,000 deposit representing a check drawn on the joint account dated January 23, received by the Peru Trust Company on January 27, the subject of a payment advice of the Lorain Bank dated January 30, and paid by that bank on February 6. Petitioner has failed to show the existence of a loan which could be the source of this deposit. The check was never debited to the joint account but was honored directly by cashier's check of the Lorain Bank. By the time the check was received by the Peru Trust Company and several days before it was paid by the Lorain Bank, the $200,000 Goldberg note had been replaced by petitioner's and Manuel's note for $125,000, all of which had been advanced no later than January 26. Manuel obtained a loan of $35,000 on January 30, but the proceeds of that loan were transferred to a bank in Michigan. Petitioner has stipulated that the $25,000 which he borrowed on February 6 was not deposited to either his personal account or the joint account. Having failed to show a nontaxable source for this deposit, petitioner must be charged with receipt of a corresponding *120 amount of income. C. The March 8 deposit
The $40,000 credited to petitioner's personal account on March 8, 1967 was drawn from the Chateau L'Aiglon account. Our findings demonstrate that the only source of deposits to that account, at least through the time of this transfer, were the trusts' bank deposits and loans. As we have previously pointed out in connection with our discussion of the February 8 deposit, supra, aside from the $25,000 loan, which is not involved herein, there is no evidence in the record before us of any borrowing by the petitioner after January 26. To be sure, the $40,000 may have come from borrowings by the trusts, but that fact is insufficient to enable us to trace this amount to a nontaxable source of petitioner. [16] We hold that petitioners must be charged with income in respect of this item. D. The June 7 deposit
Petitioner testified that the $1,000 deposited to his personal account on June 7, 1967 was paid by Manuel with respect to a purported indebtedness of Manuel to petitioner incurred in November 1966. Manuel was not questioned as to this item, and petitioner *121 did not produce any corroborating evidence to show the existence of such a debt. Assuming there was a debt, however, he did not prove that it had not been repaid in full by similar amounts previously deposited and not challenged by respondent, e.g., the February 21 and May 12 deposits, or perhaps in some other fashion, i.e., by a payment not recorded in petitioner's personal account. Our findings suggest a possible source of these funds which is at least as likely as that claimed by petitioner. We sustain respondent as to this item. E. The August 26 deposit
Petitioner deposited $4,560 in his personal account on August 26, 1967 in the form of a cashier's check of Merchants Bank listing Missouri Realty & Investment Co. as remitter. On the preceding day, American, Merchants Bank, and Missouri Realty participated in a real estate financing transaction involving several cash transfers in multiples of $4,560. At trial, petitioner produced a copy of a document purporting to be a chattel mortgage dated August 23, 1967, given by petitioner in favor of Missouri Realty & Investment Company. It recites that it was given to secure payment of a promissory note dated August 23, 1967 and *122 payable August 23, 1969, in the amount of $8,560. The document is a printed form containing blank spaces, of which one has not been completed and one incorrectly contains a description of the collateral rather than the name of the mortgagee. The document was filled in and signed only by petitioner, although a space was provided for the signature of the mortgagee. The document was not filed with the Recorder of Howard County, Indiana, until almost 15 months after its alleged execution, to-wit, on November 4, 1968. Under the foregoing circumstances, we think that the validity of the chattel mortgage, and of the underlying indebtedness which it purports to represent, is open to serious question. The other evidence of record leads us to conclude that $4,560 was derived from the real estate transaction which took place on the day preceding the deposit. The coincidences of time, parties, and amounts would otherwise be too great. We reject petitioner's assertion that the deposit was a part of the proceeds of a promissory note secured by a chattel mortgage and hold that he is taxable on this item. F. The September 5 and November 20 deposits
Petitioner deposited a total of $5,000 *123 to the personal account on the above two dates. He admitted that this money was additional salary paid by the trusts but omitted from his W-2 form. Petitioner cites sections 6674 and 7204, relating to civil and criminal penalties for furnishing false withholding statements, in support of his contention that the trusts are liable for the tax on this income and he is not. Nothing in those sections supports or even relates to petitioner's argument. The employer's liability for amounts required to be withheld (section 3403) does not relieve petitioner of his primary liability for tax on amounts which he has received without deduction for taxes. Cf. section 1.31-1(a), Income Tax Regs. Respondent is sustained as to this item. G. The December 6 deposit
Petitioner contends that the $500 deposited to the personal account on December 6, 1967 was received from Manuel in further repayment of the loan referred to in connection with the June 7 deposit of $1,000. No evidence other than petitioner's self-serving testimony was offered to show either the existence of a loan or its connection with this deposit. As in the case of the latter deposit (see pp. 20-21, supra), we cannot say that, *124 if there was a $1,500 loan from petitioner to Manuel, it was not repaid by other items deposited to petitioner's personal account for which petitioner has not been charged by respondent or in some other fashion. We hold for respondent on this item. 2. Travel and Entertainment Expenses
Petitioner seeks to deduct various items of travel and entertainment expense disallowed by respondent. That such expenses were incurred has been stipulated; respondent contends only that they have not been substantiated to the extent required by section 274 and the regulations thereunder. In order to be entitled to these deductions, petitioner must do more than persuade the Court that payments were made for ordinary and necessary business expenses; he must also produce the particular types of evidence required by law. For each expense, petitioner must establish the separate elements of amount, time, place, and business purpose. For entertainment expenses, he must also show the business relationship of the person entertained. Section 274(d). Petitioner did not keep "adequate records" in the form of an account book or diary. Section 1.274-5(c)(2), Income Tax Regs. He must therefore produce, in *125 addition to his own testimony, corroborative evidence of each element of each expenditure. To corroborate an element other than business purpose or business relationship, direct written evidence or third party testimony is required; circumstantial evidence may be used to establish business purpose or relationship. Section 1.274-5(c)(3), Income Tax Regs. We understand circumstantial evidence to require more than the taxpayer's own statement. Without listing the items enumerated in the stipulation, we hold, after careful examination of the record, that petitioner has failed to establish one or more of the required elements with respect to each expenditure and therefore is not entitled to the claimed deductions. See C. James Mathews,61 T.C. 12, 25-27 (1973), on appeal (C.A. 5, Jan. 30, 1974). 3. The Section 6653(a) Addition to Tax
We have found that petitioners received gross income far in excess of the amounts reported on their return. This fact, in itself, is indicative of negligence or intentional disregard of rules and regulations. L. Glenn Switzer,20 T.C. 759, 766 (1953). Petitioners are liable for the addition to tax imposed by section *126 6653(a). To reflect the concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in force during the year in issue.↩
2. With respect to the items at issue herein, Susan E. Fawcett is a petitioner only because she filed a joint return with her husband. References to petitioner are intended to mean Harry R. Fawcett, unless otherwise indicated.↩
3. This account was in the joint names of both petitioners and will be referred to as petitioner's or the personal account.↩
4. At all times, Herbert acted on behalf of the Lorain Bank.↩
5. The record does not show the identity of persons owning interests in the trusts, referred to herein as stock. ↩
6. At some point Manuel ceased to act as middleman and began acting on behalf of petitioner, the trusts or both, himself, or an entity known as Industrial Investments Corporation. ↩
7. There was testimony that the note was executed and delivered on or about January 5, 1967, but, for the purposes of this case, it is unnecessary to determine this fact.↩
8. No explanation of the "extra" $5 appears in the record, but it has no bearing herein.↩
9. Manuel drew two checks on the joint account on January 23, one to petitioner which is represented by the February 8 deposit, discussed infra,↩ and the other to the Peru Trust Company. The record is devoid of any indication as to when or how the latter check was paid by the Lorain Bank or what happened to the proceeds. Conceivably this check is represented by one of the two charges to the joint account on January 26.
10. It would appear that the Goldberg note may have originally been in the amount of $200,000 (see p. 5, supra) to cover the three checks to Monticello Resources Corp. and Life Mergers of America (see p. 6, supra↩) but that by this time the bank was satisfied that the checks would not be presented for payment.
11. This would appear to represent interest at 7 percent on $75,000 for 8 days based on a 360-day year.↩
12. The same certificate was the collateral for a loan of $35,000 made to Manuel on January 30, 1967, the proceeds of which were wire transferred to the Michigan National Bank, Flint, Michigan, for credit to Michigan National Trust.↩
13. Petitioner's accountant testified as to an alleged admission by respondent's agent. Whatever the evidentiary worth of such a statement in a proper context, cf. Estate of Clare W. Kyler,T.C. Memo. 1971-308↩, we find it to be wholly overborne by the weight of evidence in this case.
14. In his petition, petitioner alleged that the entire $126,060 was made up of borrowed funds. Although he offered different explanations for some items at trial, our disposition of the issues makes such variance immaterial.↩
15. While respondent does not expressly concede the non-taxable character of these two deposits, the fact is that, both in his opening and reply briefs, he directed his argument to the February 8 deposit and discussed the January 6 and 19 deposits only as part of the background of that argument.↩
16. There is no evidence of any loans by the trusts to petitioner.↩