FRED C. HALL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 21027.   Promulgated August 31, 1950.

*Eli Freed, Esq.*, for the petitioner.
*T. M. Mather, Esq.*, for the respondent.

OPINION.

HARRON, *Judge:* The issue in this proceeding is whether petitioner is taxable in 1942 on the value of shares of stock issued in his name in that year, or in 1943 and 1944 when the shares were delivered to him upon his performance of personal services pursuant to an executory contract with the Company.

Petitioner contends that he became the owner of the 50 shares in question in 1942 when the contract was signed by the parties and the shares were issued in his name; that the consideration for their issuance was the signing by him of the employment contract of November 25, 1942; and that the fair market value of the shares was income to him at that time.

Respondent contends that petitioner is taxable in 1943 and 1944 on the fair market value of the shares of stock received by him in those years and not in 1942 when the contract was entered into. He argues that the shares were only provisionally delivered to petitioner in 1942 and that petitioner did not become the unrestricted owner of any of the shares until 1943 and 1944, in each of which years 25 shares were delivered to him without restriction.

Petitioner reported his income during the years in question on the cash receipts and disbursements basis. Section 42 of the Internal Revenue Code provides that "the amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer." A taxpayer on the cash basis normally reports income in the year in which the cash or property in lieu thereof is received, even though services for which the cash or property represents payment are rendered in either an earlier or a later year. *Jackson* v. *Smietanka*, 272 Fed. 970; *S. P. Freeling*, 7 B. T. A. 1238; *Edwin B. DeGolia*, 40 B. T. A. 845; cf. *Brown* v. *Helvering*, 291 U. S. 193; *Astor Holding Corp.* v. *Commissioner*, 135 Fed. (2d) 47; *Your Health Club, Inc.*, 4 T. C. 385.

Although actual receipts remain the touchstone of the cash basis of reporting income, both decisions and regulations include constructive as well as actual receipts as income. E. g., *Corliss* v. *Bowers*, 281 U. S.

376; *Ross* v. *Commissioner*, 169 Fed. (2d) 483; *Warren E. Burns*, 11 B. T. A. 524, affd., 31 Fed. (2d) 399, certiorari denied, 280 U. S. 564. Regulations 111, section 29.42–3, which enunciates the doctrine of constructive receipt includes as taxable income all amounts owing to the taxpayer on the cash basis, whether actually received or not, which are unqualifiedly made subject to his demand in the taxable year.

Conversely, where cash or a chose in action, such as a stock certificate or a note, is not received free and clear but is subject to a restriction, the usual effect of the restraint is to postpone the inclusion of the item in taxable income until such time as the restriction is removed. E. g., *International Mortgage & Investment Corp.*, 36 B. T. A. 187; *Benjamin F. Patterson*, 21 B. T. A. 8; *Marion H. McArdle*, 11 T. C. 961; *Charles F. Mitchell*, 45 B. T. A. 300; *E. P. Madigan*, 43 B. T. A. 549.

There is no evidence in this proceeding on such matters as who dictated the policies of the Company, what its capital structure was, what assets and liabilities comprised its balance sheet, whether any of the shares held by the treasurer were ever voted, whether dividends were ever declared by the Company, and, if so, whether dividends were ever paid by the Company upon the shares which were being held by the treasurer.

Upon our examination of the limited facts which have been made available to us, we must conclude that petitioner did not receive the 50 shares in question in 1942 free and clear from restrictions which would make them subject to his unfettered command. Instead, it is held that respondent was correct in his determination that it was not until 1943 and 1944 that the shares were subjected to petitioner's control, and that the fair market value of the shares delivered in each of those years was includible in petitioner's income for the year in which they were delivered.

The petitioner had no dominion or control over the shares until they were delivered to him by the treasurer of the Company in 1943 and 1944 upon the order of the board of directors. There is no evidence that the petitioner was entitled to vote the shares prior to that time or that he was entitled to share in any dividends which might be declared by the Company. The petitioner could not sell the shares which were being held by the treasurer until they were delivered to him, and the unfettered right of sale is one of the most important attributes of ownership.

The facts which are before us in this proceeding are similar to those in other cases in which formal restrictive devices have resulted in tax postponement until the year in which the property was unrestrictedly delivered into the possession of the taxpayer. Thus, in *Phillip W. Haberman*, 31 B. T. A. 75, affd., 79 Fed. (2d) 995, the taxpayer agreed with a corporation to remain in the employ of one of its sub-

sidiaries for 3 years for a compensation consisting of a stated cash salary and the right to purchase a stated number of shares of the parent's stock. Stock certificates for fully issued and paid-up shares were issued to the taxpayer, immediately endorsed by him, and deposited with the parent to secure a loan for the full purchase price of the shares. Upon repayment of the loan in installments, in subsequent years, the taxpayer was entitled to receive the shares of stock. Upon these facts, it was held that the taxpayer, who was on the cash basis, received income in the years in which the stock was finally received by him rather than in the year in which the stock was issued.

In *Lyle H. Olson*, 24 B. T. A. 702, affd., 67 Fed. (2d) 726, certiorari denied, 292 U. S. 637, a corporate employer agreed to issue 200 shares of its stock to Olson in consideration of his continuous performance of services for the next 5 years. Each year from 1918 through 1922 a certificate for 40 shares was issued in Olson's name and delivered to a trustee designated by him. In 1922 at the end of the 5 years, the shares of stock were delivered to Olson. It was held that, since Olson reported his income on the cash basis, the entire 200 shares were includible in his income in 1922 in the amount of their fair market value. Cf. *Adolph Zukor*, 33 B. T. A. 324.

In *Marion H. McArdle, supra*, the taxpayer sold stock and as part of his consideration received a cashier's check which he endorsed and deposited with the buyer in order to guarantee the buyer against loss from accounts receivable and contingent liabilities of the corporation whose stock was being purchased. It was held that the profit represented by the portion of the sales price so deposited was not income to the cash basis seller in the year of sale, but only in the following year when received unconditionally. See, also, *Preston R. Bassett*, 33 B. T. A. 182, affd., 90 Fed. (2d) 1004.

And in *Roscoe H. Aldrich*, 3 B. T. A. 911, where a corporation agreed to compensate a taxpayer for entering into a contract with another corporation and becoming its general manager for a period of 5 years by depositing in escrow 500 shares of stock to be delivered to the taxpayer at the expiration of 5 years, the dividends declared on the stock during the escrow period to be paid to the taxpayer, it was held that the taxpayer did not become the owner of the stock until the expiration of the 5 years and its fair market value was includible in his income at that time. See, also, *Charles F. Pearce, Jr.*, 6 B. T. A. 450; *James R. Lister*, 3 B. T. A. 475.

It seems clear that in exchange for his services for the next 2 years, the Company agreed to deliver to petitioner 25 shares of stock at the end of each year when the services had been performed. Performance of the services was a condition precedent to the delivery of the stock to petitioner. Petitioner argues that the signing of the

contract to perform services in the future was sufficient consideration to make him the owner of the stock in 1942. But the Company was contracting for petitioner's services, not for his promise. The bare promise without the services had no value. The services called for by the contract were not performed until 1943 and 1944, in each of which years a certificate for 25 shares was delivered to petitioner for the services which he had rendered.

Moreover, petitioner's contention that the mere signing of ·the contract was sufficient consideration for the transfer to him of ownership of the 50 shares is clearly contrary.to the laws of the State of Ohio which were in effect at the time the parties entered into the contract. Section 8623–22, Page's Ohio Gen. Code Ann., in effect in 1943, reads as follows:

*Payment for shares.—* * * *Shares shall be issued only* for money, or for other property, real or personal, tangible or intangible, actually conveyed or transferred to the corporation for its use and lawful purposes, or in its possession as surplus, or *for labor or services actually rendered to the corporation.* [Emphasis added.]

*     *     *     *     *     *     *

Every person who shall subscribe for shares without par value, or to whom such shares are to be issued, except as a share dividend, shall be obligated to pay the corporation therefor, in money or such other property or labor or services, such amount of consideration for each share as may have been determined as hereinbefore in this act provided.

Thus, under the laws of Ohio, petitioner could become the owner of the shares only upon the actual performance of the required services. See, also, Fletcher, Cyclopedia of the Law of Private Corporations (Perm. ed.), section 5187, pp. 424 et seq. And the laws in effect at the time shares of a corporation are issued become a part of the contract between the corporation and its shareholders and the parties to such agreement are presumed to know the extent of the authority granted the corporation by the applicable statutes then in effect. *Schaffner* v. *Standard Boiler & Plate Iron Co.*, 150 Ohio St. 454, 83 N. E. (2d) 192.

Petitioner places considerable reliance upon the case of *Schneider* v. *Duffy*, 43 Fed. (2d) 642. However, the facts in *Schneider* v. *Duffy* are distinguishable from the facts in this proceeding. In the *Schneider* case, the employment agreement provided that the corporation would assign "an equitable ownership" in 1,500 shares of stock to Schneider; that he was "entitled to receive and enjoy all of said 1,500 shares", and that all dividends declared on the 1,500 shares would be transmitted immediately to Schneider. Schneider also had the right to vote all 1,500 shares. As a basis for its decision that the fair market value of all 1,500 shares was income in the year in which the contract was executed, the district court of New Jersey emphasized the fact that the stock agreement was not a contract for additional salary,

but that it was an incentive given to Schneider, who had no ownership in the company, to remain with the business after he had expressed an intention to sever his connection therewith and organize a competitive company.

In this proceeding, however, petitioner needed no incentive in the form of stock to work for the Company. His former job as manager of the jig and fixture division of the American Coach & Body Co. no longer existed upon the sale of that division outright to the Company. The Company did not agree to deliver a total of 50 shares of its stock to petitioner in order to persuade him to leave his employment with another corporation or to influence him to remain with the Company after he had expressed his intention to leave. Petitioner already had sufficient incentive as one of the organizers of the Company. In addition, under the employment contract, petitioner was entitled to 10 per cent of the profits earned each year by the Company above $5,000.

The facts in this proceeding are more closely akin to those relied upon by the Board of Tax Appeals in *Anthony Schneider*, 3 B. T. A. 920, where, upon consideration of the same fact situation as that present in *Schneider* v. *Duffy, supra*, it was held that income was taxable in the years subsequent to the issuance of stock. In the Board's view of the evidence, the agreement was entered into by the company in exchange for the services of Schneider and his agreement to remain with the company for the next 5 years. On these facts, the Board held that "performance of the agreements was the *quid pro quo* to the delivery of the absolute title to the stock," rather than the issuance of the stock, and that the fair market value of the stock was includible in Schneider's income in the years in which the certificates therefor were delivered to him without restriction. In subsequent cases, we have cited this decision of the Board with approval. *Charles F. Pearce, supra; K. E. Merren*, 18 B. T. A. 159; *Lyle H. Olson, supra; Albert R. Erskine*, 26 B. T. A. 155; *Charles Chaplin*, 46 B. T. A. 385, reversed on another issue, 136 Fed. (2d) 298.

Petitioner also relies upon *Chaplin* v. *Commissioner*, 136 Fed. (2d) 298, reversing in part 46 B. T. A. 385. We fail to see how that decision is authority for the contentions made by the petitioner. In the *Chaplin* case, the stock was issued in consideration of property in the form of photoplays to be delivered by Chaplin to the corporation, rather than for services to be rendered in the future. The stock was placed in escrow until such time as Chaplin delivered the photoplays. In reversing the decision of the Board of Tax Appeals that the fair market value of the stock was includible in Chaplin's income in the year in which he delivered the photoplays and the stock was returned to him, the Court of Appeals relied upon the fact that the agreement

specifically provided that Chaplin was the owner of the stock; that Chaplin had at all times the right to vote the stock, and that dividends on the stock were declared and paid to the escrow agent who held them for Chaplin's benefit. These facts are not present in the instant proceeding. Moreover, on the issue of whether the dividends which had been declared on the stock and paid to the escrow agent for Chaplin's benefit in prior years were includible in Chaplin's income in the year in which they were released to him upon delivery of the photoplays, the Court of Appeals held that the dividends were properly includible in Chaplin's income in the year of their release when they were unqualifiedly made subject to his demand, rather than in the years in which they were paid to the escrow agent. The decision on this issue supports the contention of respondent that the fair market value of the shares of stock was not includible in petitioner's income until the years 1943 and 1944, in each of which years 25 shares were delivered to petitioner without restriction.

It is held that the fair market value of the 25 shares delivered to petitioner in the year 1943 is includible in his gross income for that year, and the fair market value of the 25 shares delivered to petitioner in the year 1944 is includible in his gross income for that year.

*Decision will be entered for the respondent.*