NATIONAL CLOTHING CO. OF ROCHESTER, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILLARD D. AVERY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 49334, 49397. Filed February 28, 1955.

*Dean P. Kimball, Esq.*, for the petitioners.
*A. W. Dickinson, Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge:* The Commissioner determined deficiencies in income tax of $20,704.16 and $27,226.75 against the corporation for its fiscal years ended January 31, 1949 and 1950, and he also determined a deficiency in income tax against Avery of $8,908.13 for the calendar year 1949. The only issue for decision is whether certain amounts represented additional compensation from the corporation to employees or whether they represented a part of the purchase price of stock. The parties have filed a stipulation and joint exhibits which the Court adopts as findings of fact.

The National Clothing Company of Rochester, Inc., hereafter called National, is a corporation engaged in the sale at retail of clothing and accessories. It used a fiscal year ending January 31 and an accrual method of accounting. Its returns for the tax years were filed with the collector of internal revenue for the twenty-eighth district of New York. Avery filed his return for 1949 with the collector of internal revenue for the twenty-eighth district of New York.

John A. Morton and Avery had been employed for many years by National. They were directors, officers, and key employees. Richard L. MacNaughton was a key employee from June 2, 1933, until the date of his resignation.

Morton requested in 1923 that he be given an opportunity to buy some stock of National under a plan similar to that which had been used with former employees. He and National entered into a contract on June 2, 1933, which recited that he was employed by National for an indefinite term, which might be terminated at the will of either party, and had purchased 30 shares of its common stock to be held upon the terms and conditions of the agreement. Morton acknowledged his indebtedness to National for $2,988.88, the purchase price of the stock for which he delivered his promissory note, without interest, payable on or before June 2, 1938. He endorsed and delivered the certificate for the stock to National as collateral security for payment of the purchase price. All dividends on the shares were to be retained by the company and applied in payment of the purchase price until it was paid in full. Morton had the right to make additional payments on the indebtedness. The company retained the right to repurchase the shares if Morton should cease to be employed by the company and agreed to repurchase them at any time upon Morton's demand, canceling other indebtedness owed it by Morton as a part of the purchase price. The purchase price was to be the book value of the shares on the last business day of the last full calendar month immediately preceding the actual transfer of the shares. The book value was defined to exclude intangibles. Morton was not permitted to dispose of the shares without the consent of National except to National or its principal stockholder. The certificates were endorsed to show the restrictions above mentioned. The purchase price of $2,988.88 represented the book value of the stock on January 31, 1923. Morton's note was paid in full on January 31, 1935, by the application of a part of a bonus paid to him by National at that time. The shares of stock were issued in Morton's name and were held by National until January 31, 1935, when they were returned to Morton. Thereafter, Morton received and used the dividends as his own.

Avery and National entered into a contract with like provisions on June 2, 1933, whereby Avery purchased 30 shares of National for $5,404.20, representing the book value of that stock at that time. He likewise endorsed the certificates issued in his name and delivered them to National as security for his non-interest-bearing note due June 2, 1938, for the purchase price. National issued checks for dividends to Avery. He immediately endorsed them and delivered them to National for application upon the purchase price of his shares.

Morton and National entered into a supplemental contract with like provisions on March 1, 1938, covering 30 additional shares of the stock at a purchase price of $11,018.09, representing the book value

of those shares at that time. He gave his non-interest-bearing demand note for the purchase price and endorsed and redelivered the shares to National as security for the debt.

MacNaughton and National entered into a contract with like provisions on May 9, 1941, whereby MacNaughton purchased 30 shares for $14,177.50, the book value of the stock at that time. He gave his non-interest-bearing demand promissory note to National for that amount and endorsed and redelivered the shares to National as security for the debt.

There were 2,940 shares of National stock outstanding in 1933, all of which were held by Jesse S. Horwitz and his father, Abraham F. Horwitz, except for the 60 shares owned by Morton and Avery. There were 1,680 shares outstanding in 1938, of which 890 were owned by Jesse, 60 were owned by Morton and Avery, and 730 were owned by "others." There were 1,680 shares outstanding in 1941, of which Jesse owned 890, Avery owned 30, Morton 60, and "others" owned 700. Thereafter there was no change in the relative stockholdings except for the issuance of the shares to MacNaughton, which shares had not been outstanding immediately prior thereto.

Morton's employment by National was terminated in February 1948, at which time he surrendered to National, in accordance with the contract and supplement thereto, all of its shares which he had bought or was buying and received from National $59,736.32, representing the difference between $68,491.62, the book value of the shares, and amounts which he owed National, including the unpaid balance on his note given at the time of the supplemental contract.

Avery's employment by National terminated in 1949 during National's fiscal year ended January 31, 1950, at which time, in accordance with his contract, he surrendered his stock in National and received from the latter a check for $36,837.84, representing the difference between $38,522.85, the book value of the shares, and the unpaid balance of the purchase price which he owed.

MacNaughton's employment by National ceased during the latter's fiscal year ended January 31, 1950, and in accordance with their contract he surrendered his shares in National and received from National its check for $21,028.24, representing the difference between $38,819.15, the book value of the shares and various amounts which he owed National, including the unpaid balance on his note given for the purchase of the shares.

National then canceled the stock received from these three individuals.

National, in order to reflect its transactions with Morton, Avery, and MacNaughton, established accounts on its books with each of

them entitled "Notes Receivable." Payments on the notes were credited to that account. National did not claim any deduction or credit in any prior year with respect to the amounts which it is now claiming as deductions in the taxable years. It did not claim any deduction or credit in prior years on account of the amounts paid or credited as dividends on the stock in the names of the three employees, "except in those years in which dividends were paid or credited and to which the undistributed profits surtax was applicable."

National, in its return for its fiscal year ended January 31, 1949, claimed a deduction of $62,622.74 as additional compensation paid to Morton. That amount represented the book value of the shares less the amount received from Morton in payment for those shares and the dividends credited as payment. National likewise claimed, by similar computations on its return for its fiscal year ended January 31, 1950, a deduction of $36,362.85 in the case of Avery and $35,759.15 in the case of MacNaughton.

Avery, in his return for 1949, reported a long-term capital gain of $33,118.65 from the sale of his National shares, of which one-half was reported as income.

The Commissioner, in determining the deficiencies against National, disallowed the $62,622.74 for the first fiscal year and the $72,122 for the second fiscal year.

The Commissioner, in determining the deficiency against Avery, eliminated the long-term capital gain of $16,559.33 from income and included the $33,118.65 as compensation.

There was, in addition to the stipulated facts (summarized above) testimony from which the following facts are found:

The purpose of National in entering into contracts with employees for the purchase of stock was to try to get a few loyal employees interested in the over-all problems of the business in addition to the specific responsibilities assigned to them.

There was an oral agreement between National and Morton in 1924 that he would be allowed to purchase some stock. The written agreement of June 2, 1933, took the place of that oral agreement and was related back to the fair market value of the stock on January 31, 1923, because of that oral agreement.

None of the three employees was able to pay for the stock at the time he entered into the contract for its purchase, and the intention was that the purchase price in each case would be paid out of dividends on the stock. The stock would not have been sold on like terms to outsiders. No interest was charged on the notes because National did not want to impose that obligation upon the employees. The company never claimed deductions for the dividends paid on the

stock as compensation because that would have defeated its purpose by adding a tax burden to the purchasers.

National, at the time it entered into the contracts, intended to exercise its right to repurchase the stock when the services of each purchaser terminated.

Avery attended stockholders' meetings and voted his stock. Morton attended some meetings and voted his stock and at others voted by proxy. MacNaughton did not attend stockholders' meetings but voted his stock by proxy.

National never told Morton that the stock which he purchased was compensation for his services or that a part of the repurchase price was compensation for services. He reported a long-term capital gain from the sale of his stock on his 1948 income tax return.

This further finding based upon the entire record is made:

The employees and the corporation understood at all times material hereto that the corporation could require no payments for the stock except by the retention of dividends declared thereon.

The Commissioner contends that the transactions with the three employees were sales, and the excess of the amounts which National paid in the taxable years to reacquire the shares over the costs of those shares to the employees are to be treated for tax purposes as the amounts realized by the employees from sales, whereas National contends that the excess of the book values of the shares when reacquired over the book values at which it first transferred them represents compensation for services. The Commissioner raises no question of the amounts or the reasonableness of the compensation nor does he raise the question of whether any part of the alleged compensation to Morton might have been received in 1935 when 30 shares were delivered to him, and those questions are not decided. The position which the Commissioner has taken in the case of National is conceded to be inconsistent with that which he has taken in the case of Avery, but he argues that the position he has taken in the case of National is correct and should be sustained.

Arrangements somewhat similar to those here involved have been regarded for tax purposes as the payment of compensation rather than sales. *Alger-Sullivan Lumber Co.* v. *Commissioner*, 57 F. 2d 3, reversing 20 B. T. A. 1109; *Moore* v. *McGrawl*, 63 F. 2d 593; *Hudson Motor Car Co.* v. *United States*, 3 F. Supp. 834; *Indianapolis Glove Co.* v. *United States*, 96 F. 2d 816. Cf. *Commissioner* v. *Smith*, 324 U. S. 177; *Albert Russel Erskine*, 26 B. T. A. 147, which cited with approval *Alger-Sullivan Lumber Co.* v. *Commissioner, supra; Patent Button Co.* v. *Commissioner*, 203 F. 2d 479.

Probably there was no very clear understanding between National and its employees, at the time the contracts were entered into, that compensation for services was or was not involved. However, it is reasonably clear that the three employees were not in a financial position to pay for the shares and both parties understood that no payments would be required except by the retention of dividends declared on the stock. Thus the parties intended that National was not entitled to receive any money for the shares and the employees were not required to pay any of their money for them. National, of course, never made demand upon any of the three employees for payment of the purchase price of the shares. The first written contracts were entered into on June 2, 1933, and no dividends or other amounts were applied to the purchase price prior to January 31, 1935. Morton on that date voluntarily paid his note with part of a bonus which he had just received from National. The only other payments made on account of the shares involved herein were by the application of dividends on those shares. The contracts specifically referred to the employment of these individuals and gave the company the right to repurchase the shares upon the termination of their employment. It has been testified without contradiction that the company at all times intended to repurchase the shares pursuant to the contracts upon the termination of the employment of the individual, and they were repurchased as each individual's employment terminated. Thus the benefits were limited to the periods of employment of the employees. The notes bore no interest and no interest was ever paid on the indebtedness. The employees could not lose in these transactions. The shares were all held by National as, collateral except for those delivered to Morton in 1935, at which time he paid the "purchase price" agreed upon for those shares. The employees could not sell any of these shares without the consent of National and National did not intend that any of them should go into the hands of outsiders.

It seems reasonable to conclude from all of the terms of the contracts and from all other pertinent facts in the record that these transactions, although in form sales, were in substance not sales but rather a means of compensating these employees for the services which they were expected to render to the corporation so that it would prosper and the book value of its stock would increase, thus benefiting both employer and employee. *Indianapolis Glove Co.* v. *United States, supra; Alger-Sullivan Lumber Co.* v. *Commissioner, supra; Moore* v. *McGrawl, supra.* Cf. *Charles E. Sorensen,* 22 T. C. 321.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*