FORD S. WORTHY, JR., AND ISABEL C. WORTHY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5105–71. Filed June 12, 1974.

*Herman Wolff, Jr.*, for the petitioners.
*Wright Tisdale, Jr.*, for the respondent.

SIMPSON, *Judge:* The respondent determined the following deficiencies in the petitioners' Federal income taxes:

| Year | Deficiency |
|------|-----------|
| 1967 | $918.99 |
| 1968 | 804.26 |
| 1969 | 1,001.81 |

Due to concessions, two issues remain for consideration: We must first decide whether certain payments received in connection with the redemption of certain stock constituted additional compensation or capital gains. Second, we must decide whether the petitioner has shown that, within the meaning of section 274(a) of the Internal Revenue Code of 1954,[1] he used his membership in a country club primarily for business purposes so that he is entitled to deduct the dues for such membership.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Ford S. Worthy, Jr., and Isabel C. Worthy, husband and wife, resided in Raleigh, N.C., at the time of filing their petition herein. For the years 1967, 1968, and 1969, they filed their joint Federal income tax returns, using the cash method of accounting, with the director, Southeast Service Center, Chamblee, Ga.

Mr. Worthy is a member of the American Institute of Real Estate Appraisers and is designated as an MAI, which refers to an appraiser with certain training and experience. Prior to the fall of 1957, he was employed in the City Mortgage Department of the Equitable Life Insurance Co. His duties consisted of negotiating commercial and industrial mortgages and appraising properties offered as security for such loans. In the fall of 1957, Mr. Worthy was employed as an assistant to J. W. York to work for Cameron Village, Inc. (Cameron), a corporation Mr. York controlled. Cameron's primary asset was the Cameron Village Shopping Center in Raleigh, N.C. Mr. Worthy's starting salary was $10,000 per year. His previous experience with the Equitable Life Insurance Co. was helpful in carrying out his duties of negotiating loans and leases for the shopping center. He later became vice president and general manager of Cameron. Mr. Worthy worked for Cameron until 1966 or 1967, and throughout the period from 1962 to 1965, it was his main employment.

In 1957, Mr. York was also involved in the development of a separate shopping center, known as the Northgate Shopping Center (Northgate), located in Durham, N.C. After Mr. Worthy was hired to work for Mr. York, Mr. York assigned him duties in connection

---

[1] All statutory references are to the Internal Revenue Code of 1954.

with Northgate. In 1959, Mr. Worthy's Northgate activities began to require a considerable amount of his time. He assisted Mr. York in the general development of Northgate. Both negotiated some leases separately, and on some occasions, Mr. Worthy assisted Mr. York in his negotiations. Mr. Worthy also communicated with the architect, the general contractor, and the principal owners of Northgate, the Rand family. He also assisted Mr. York in obtaining financing for Northgate.

Construction of Northgate began in 1959, and the first store opened in September 1960. In 1962, it had a supermarket, variety store, and drugstore; it was identifiable as a shopping center. In addition, other stores were planned at that time and leases had been negotiated and secured. The leases were obtained in a competitive market as there were two other shopping centers under construction in Durham at the same time, which were seeking leases from the same tenants as Northgate. On one occasion, a store originally signed a lease with one of the other shopping centers, but eventually moved to Northgate.

Mr. York's association with Northgate began in 1956, when the Rand family, the owners of the property on which Northgate was built, approached Mr. York with a view toward employing him to develop the land. They wanted to employ him because of "his experience, performance in Cameron Village, and his qualifications as a developer." On or about February 9, 1956, Mr. York agreed to supervise the development and operation of the proposed shopping center, and on or about August 21, 1956, the parties reached an oral agreement respecting the terms and conditions on which Mr. York would provide the desired assistance. One of the conditions required by Mr. York was that he be allowed to purchase some of the Northgate stock. Pursuant to another condition of the oral agreement, on or about January 11, 1957, the Rands transferred the property to Northland Investment Co., Inc. (Northland), a corporation all of whose outstanding stock was owned by them.

By an agreement dated April 1, 1959, Mr. York, the Rands, and Northland set forth in a written contract (the contract) the terms of their future association in the development of Northgate. In part, the contract provided that Northland change its name to Northgate Shopping Center, Inc. (the corporation). The contract detailed the duties Mr. York was to perform for the corporation. His duties ranged over a number of areas, all of which were directed toward developing and operating Northgate. He was to secure financing, direct architectural planning and improvements, select building contractors and suppliers, and select employees. He was also to direct all matters pertaining to leasing the business premises in Northgate. He was given

the duty of selecting a manager and retaining the professional assistance of architects, accountants, and attorneys. In determining a course of action, Mr. York was required to obtain the consent and approval of the corporation's board of directors before he carried out his planned action. As compensation for his various duties and services, he was to receive the lesser of $12,000 per year or 5 percent of the gross rentals collected from Northgate during the preceding fiscal year.

The corporation had authorized capital stock of 1,000 common shares, par value $100. The contract provided that the corporation would change its authorized capital stock to 1,000 common shares, par value $1, and 99,000 shares, 5-percent cumulative nonvoting preferred, par value $1. The Rands were to receive 850 common shares and 15,600 preferred shares in exchange for the outstanding stock previously owned by them. Mr. York agreed to purchase 150 shares of common for $150.

The contract also contained several provisions giving one party an option to purchase some or all of the stock of another party. The first option dealt with the purchase of Mr. York's stock. The corporation was given an option to purchase Mr. York's stock for $250,000 after the first fiscal year during which the corporation had gross rentals of $300,000 or more. In the event the corporation failed to exercise the option, Mr. York could exercise an option to purchase 360 shares of the Rands' stock for $600,000. If either option was exercised, payment could be made by means of a negotiable note, payable over a period of 10 years. Further options were given to the corporation and Mr. York in the event the gross rentals did not equal or exceed $300,000 in any 1 fiscal year within 10 years after the making of the contract. The prices to be paid under these options were to be determined by various multiples of the previous annual salary paid to Mr. York. In case Mr. York's stock was to be purchased, the multiplier was 20; however, the sum paid to Mr. York could not be less than $25,000, nor greater than $250,000. The contract also granted the corporation options to purchase Mr. York's stock in the event of his disability or death, and it was to obtain insurance on Mr. York's life. The contract terminated upon the exercise of the options to purchase stock contained therein. The stock subject to the options was all placed in escrow to be held so long as any of the options could be exercised.

On May 31, 1962, Mr. York and Mr. Worthy entered into a written agreement which reflected their prior oral understanding, in accordance with which Mr. Worthy had been assisting Mr. York in fulfilling his duties under the contract. In 1960, Mr. York had told Mr. Worthy that he would transfer to Mr. Worthy 20 percent of his equity in the corporation. Mr. Worthy had not bargained with Mr. York for the interest. The written agreement contained provisions whereby Mr. York

agreed to transfer 30 of his 150 shares in the corporation, subject to the terms of the contract, and 20 percent of his options in the Rands' stock to Mr. Worthy.

In setting forth the reasons for making the agreement, it was declared:

WHEREAS, pursuant to the terms and provisions of * * * [the contract], NORTHGATE has agreed to employ YORK for certain services upon the terms and conditions set forth therein; and

WHEREAS, WORTHY is presently employed by Cameron Village, Inc., a North Carolina corporation controlled by YORK and is associated with YORK in several business ventures; and

WHEREAS, WORTHY has, upon direction from YORK and pursuant to certain oral understandings between them, assisted YORK in the performance of certain duties prescribed for YORK under the terms of * * * [the contract] and will in the future further assist YORK in the performance of such duties; and

WHEREAS, YORK and WORTHY now desire to reduce to writing the terms and conditions of their oral understandings pursuant to which WORTHY, at the direction of YORK, has been assisting YORK in his duties under * * * [the contract];

Now, THEREFORE, in consideration of the premises, the mutual promises hereinafter set forth * * *, the parties do hereby agree as follows:

A separate paragraph provided that:

(3) WORTHY shall assist YORK in the performance of his duties provided in * * * [the contract] as YORK may from time to time direct, and as compensation for such services to be rendered by WORTHY under YORK's direction, WORTHY, so long as this agreement remains in force and effect, shall receive an annual salary equal to 20% of such compensation as YORK receives pursuant to * * * [the contract] for such year.

In the event that Mr. Worthy ceased to be employed by Cameron and the association between him and Mr. York in all other business ventures was severed, Mr. York was given an option to reacquire Mr. Worthy's stock and options. The price for the reacquisition was to be Mr. Worthy's previous annual salary multiplied by 20. Mr. Worthy also agreed that if he exercised his options on the Rand stock, Mr. York had an option to repurchase the 30 shares and the shares accruing from the exercise of the option. The price was to be an agreed-upon fair value. The agreement was to terminate upon the purchase of shares or by the expiration of the options.

The stock given to Mr. Worthy in accordance with the agreement was actually held in escrow, together with Mr. York's and the Rands' stock. He gave no cash consideration for the stock. In 1960, Mr. Worthy felt that the stock had potential value, but was not useful to him as he could not borrow money on it. The Rands consented to the agreement, but considered Mr. York to be the one primarily responsible for the performance of the services required by the contract.

Sometime in June or July of 1965, Mr. York and Mr. Worthy were advised by the corporation that the gross rentals from its shopping

center for the fiscal year ending May 31, 1965, had exceeded $300,000, and that it was exercising its option to purchase the shares owned by them. The total purchase price was $250,000, with Mr. York to receive $200,000 and Mr. Worthy to receive $50,000. Pursuant to the installment arrangement authorized by the contract, on September 1, 1965, Mr. Worthy received a $50,000 promissory note, payable in 10 annual installments of $5,000 each, beginning in September 1966. Similar notes were received by Mr. York in the amount of $200,000. In accounting for the acquisition of its stock, the corporation debited its capital stock and retained earnings accounts. The cost of the stock was not deducted on its Federal income tax returns, and the payments were not treated as compensation by the corporation. In 1967, 1968, and 1969, the corporation paid $5,000 each year to Mr. Worthy.

The agreements between the Rands and Mr. York, and Mr. Worthy and Mr. York, provide that they inure to the benefit of the parties and their assigns. Neither prohibits any sale or transfer of the stock or options by the Rands, Mr. York, or Mr. Worthy. Both could be modified if agreed to by the signing parties. However, the escrow agreement stated that the trustee was to dispose of the certificates it held only on specified conditions, although the shareholders could alter, revoke, or terminate the escrow agreement at any time. Legal title to the shares remained in the shareholders; the assigns of the shareholders would be bound by the escrow agreement.

The Rands considered the corporation to be a family corporation. In 1959, the stock would not have been offered at $1 per share to anyone who was not, or would not have become, a participant in the development of the shopping center. The Rands were also very selective about whom they would involve in their businesses. However, there were no reservations about giving Mr. York an equity interest because of their desire to have him as the developer. In 1962, the Rands would not have consented to a transfer of 30 shares to an outsider whose participation in the business was limited to stock ownership.

In 1959, 1965, and 1966, no salary was paid by the corporation to Mr. York. The following payments were made by the corporation to Mr. York and by Mr. York to Mr. Worthy:

| Year | The corporation to York | York to Worthy |
| --- | --- | --- |
| 1960 | $259. 32 | $51. 86 |
| 1961 | 5, 018. 83 | 1, 377. 00 |
| 1962 | 14, 278. 78 | 2, 855. 70 |
| 1963 | 12, 261. 11 | 2, 452. 20 |
| 1964 | 5, 000. 00 | 1, 000. 00 |
| 1967 | 18, 454. 59 | 2, 740. 00 |

| Year | | The corporation to Worthy and company |
| --- | --- | --- |
| 1967 | | $1, 050. 58 |
| 1968 | 5, 557. 55 | 1, 019. 11 |
| 1969 | 3, 115. 76 | 1, 830. 39 |

The payments Mr. Worthy received from his work on Northgate were in addition to other amounts he received for services he performed for Mr. York in other areas. The salary paid by the corporation to Mr. York pursuant to the contract, in an amount equal to 5 percent of the gross rental receipts, was, at that time, comparable to the compensation received by similar developers who did not own any equity in the development. The payments Mr. York and Mr. Worthy received subsequent to 1966 were made in return for their services in negotiating leases for additional tenants and for other services. They represented compensation for services performed during that period and not for services performed before 1965. The payments were based on rentals paid by some tenants. During 1967, 1968, and 1969, Mr. Worthy was self-employed and primarily engaged in appraising properties.

During the years 1967 through 1969, Mr. Worthy belonged to the Carolina Country Club, Raleigh, N.C. He had been a member since 1959, his initial membership fee having been paid by Mr. York. The club has dining and entertaining facilities, a golf course, tennis courts, and a swimming pool. The club was private and restricted to use by its members and their guests.

Many of the leading business people and members of the Chamber of Commerce of Raleigh belonged to the club. Since going into business for himself, Mr. Worthy has had profitable associations with a number of these people; he has negotiated leases and made sales and appraisals for them. Mr. Worthy and his family used the facilities of the club for business and personal purposes. On occasion, his children took the children of his business associates to the club. Once, Mr. Worthy allowed a business associate who was not a member to use the club.

When Mr. Worthy and his family used the club, they usually signed tickets, charging their expenditures to their membership account. Of the 81 tickets issued in the 3 years, 8 were issued in the course of entertaining Mr. Worthy's business associates. Over the 3 years, he paid a total of $1,060 in dues to the club and $431.12 for other expenditures, of which $18.98 was paid pursuant to the business entertainment.

Members of the club were billed for dues and expenditures on approximately a monthly basis. After Mr. Worthy received the monthly bill and supporting tickets, he examined them to determine which he would pay by his personal check and which he would pay by a check from his business account. When tickets had been issued pursuant to entertaining business associates, notes were sometimes made on the tickets indicating that fact. His business was charged with paying the monthly dues.

On their Federal income tax returns for the years 1967, 1968, and 1969, the petitioners treated the annual payments received in connection with the transfer of the stock of the corporation as capital gains and included a deduction for all the dues paid to the country club. In his notice of deficiency, the respondent determined that the payments were ordinary income and that not all the dues were deductible.

OPINION

The first issue we must decide is whether the payments Mr. Worthy received from the corporation in connection with the redemption of his stock constituted compensation or proceeds from the sale of stock taxable as capital gains.

In *Commissioner* v. *Smith*, 324 U.S. 177, 181 ('1945), the Supreme Court declared:

Section 22(a) of the Revenue Act [corresponding to the present sec. 61] is broad enough to include in taxable income any economic or financial benefit conferred on the employee as compensation, whatever the form or mode by which it is effected. * * *

In a variety of circumstances, the question has arisen as to whether economic benefits received by employees constituted additional compensation. In *Commissioner* v. *LoBue*, 351 U.S. 243, 247 (1956), the Supreme Court said:

When assets are transferred by an employer to an employee to secure better services they are plainly compensation. It makes no difference that the compensation is paid in stock rather than in money. * * *

In that case, an employee had an option which he exercised and acquired stock for less than its value. Although the facts of the present case are different, the principles of *Smith* and *LoBue* are equally applicable: If the arrangement for the transfer of the stock to Mr. Worthy and for its subsequent purchase by the corporation was to provide him with additional economic benefit for his services or "to secure better services," then the economic benefit represents additional compensation. In judging the purpose for the arrangement, we must rely upon our "experience with the mainsprings of human conduct." *Commissioner* v. *Duberstein*, 363 U.S. 278, 289 (1960).

When in 1959 the contract was made among Mr. York, the Rands, and the corporation, the Rands were anxious to secure the services of Mr. York, and in addition to paying him the customary cash compensation for his services, they agreed to include in the contract several options. These options enabled him to share in the success of Northgate. If the enterprise prospered, Mr. York had the option of either selling his stock to the Rands for more than 1,000 times what he paid for it or the option of acquiring a controlling interest in the corpora-

tion. Even if the enterprise did not realize substantial profits in the first 10 years, he could still realize a sizable profit on the sale of the stock at the end of the 10-year period. Should he become disabled or die, his stock could be purchased by the Rands at a price determined by reference to the cash compensation paid to him under the contract.

In the written agreement between Mr. York and Mr. Worthy in 1962, it was expressly stated that the agreement was being made because of the assistance Mr. Worthy was furnishing Mr. York in the performance of his obligations for the development of Northgate. Mr. Worthy gave no cash consideration for the stock, but there is no evidence indicating that the transfer was motivated by disinterested generosity. *Commissioner* v. *LoBue, supra.* The provision for the transfer of the stock was included in an agreement which covered the terms of compensating Mr. Worthy for his services in connection with the development of Northgate. *William H. Husted,* 47 T.C. 664 (1967). There is no evidence that Mr. Worthy sought to purchase the stock as an investment. Compare *Oliver R. Aspegren, Jr.,* 51 T.C. 945 (1969). Furthermore, Mr. Worthy could retain the stock only so long as he continued to work for Mr. York, and in the event he had to sell the stock to Mr. York, the purchase price was determined by reference to his compensation for services in connection with the Northgate development. *Ruth Jackson,* 25 T.C. 1106 (1956). In the light of these circumstances, the conclusion is inescapable that the stock was transferred to Mr. Worthy to enable him also to share in the success of Northgate and thereby to provide him with an additional economic benefit for the services rendered, and to be rendered, by him in connection with the Northgate development.

Although Mr. Worthy gave no cash consideration for the transfer of the stock and options, the record clearly establishes that he was virtually assured that he would receive a substantial economic benefit from them. The contract and the employment agreement contain several provisions which ensure that at some point Mr. Worthy would receive significant sums of money for his stock. If the corporation had gross rental receipts of $300,000 or more in any year and chose to exercise its options, Mr. Worthy would receive $1,666.67 per share, which is what he eventually received. If the corporation did not exercise its option at that time, Mr. Worthy had the right to purchase 72 shares at $1,666.67 per share, but he was not required to do so, if he was unable to make the purchase or considered it inadvisable. Although Mr. York had the right to purchase any stock acquired by Mr. Worthy at its fair value, which might be less than $1,666.67 per share, he would still have the 30 shares, and the chances are that he would be left with a substantial net gain. If the corporation was not successful and did not have $300,000 of gross rental receipts in any year during the life

of the contract, Mr. Worthy still stood to gain. In that event, the corporation had an option to purchase his stock at the end of the term of the contract. The price was to be determined by Mr. York's salary—in no case would Mr. Worthy receive less than $5,000, and he could receive as much as $50,000. Mr. Worthy would also have gained if he terminated his business relationship with Mr. York—in that event, Mr. York had an option to purchase Mr. Worthy's shares for 20 times his previous annual salary.

Of course, it was possible that the corporation might fail and the stock become worthless. However, Mr. Worthy made no outlay for the stock, and if the stock became worthless, he would have lost nothing, except for his hope and expectation. Thus, he had the certainty of no loss and the possibility of a handsome gain. *Commissioner* v. *LoBue*, 351 U.S. 243 (1956); *Estate of Merlin H. Aylesworth*, 24 T.C. 134 (1955); see also *National Clothing Co. of Rochester*, 23 T.C. 944 (1955).

In *Commissioner* v. *Smith*, 324 U.S. 177 (1945), the Supreme Court found that an employee realized additional compensation, not by the transfer of an option, but by its exercise. The Court said:

And as the option was not found to have any market value when given, it could not itself operate to compensate respondent [taxpayer]. It could do so only as it might be the means of securing the transfer of the shares of stock from the employer to the employee at a price less than their market value, or possibly, which we do not decide, as the option might be sold when that disparity in value existed. Hence the compensation for respondent's [taxpayer's] services, which the parties contemplated, plainly was not confined to the mere delivery to respondent [taxpayer] of an option of no present value, but included the compensation obtainable by the exercise of the option given for that purpose. * * * [*Commissioner* v. *Smith, supra* at 181–182.]

The petitioners have not argued that the stock had value in 1962 which was taxable at that time, and they have offered no evidence to establish its value at such time. It is clear that the stock's value in 1962 was highly speculative.

Although the stock was not subject to any express restrictions on transferability, the parties to the contracts and agreements apparently considered that it could not be transferred without the approval of all of them. The Rands considered the corporation to be a family corporation, and they were very selective in choosing the persons who shared in their businesses. They would not have approved of the sale of the stock to Mr. York, except for their wish to have him manage Northgate, and they would not have approved of the transfer of the stock to Mr. Worthy, except for his participation in the development. Furthermore, the stock was subject to a host of conditions and restrictions. It could be reacquired by Mr. York if Mr. Worthy terminated his business relationship with Mr. York, and it was subject

to all the options and conditions contained in the contract between Mr. York and the Rands. These circumstances convince us that the purpose of the arrangement was not to provide Mr. Worthy with additional compensation in 1962 as a result of the transfer to him, but to reward him with what amounted to a bonus if the enterprise succeeded.

In support of their position, the petitioners made several arguments which we found unconvincing. The cases relied upon by them involve transactions which the courts found as a fact were not compensatory. Moreover, such cases arose before the decisions of the Supreme Court in *Commissioner* v. *Smith, supra,* and *Commissioner* v. *LoBue, supra.* The petitioners suggest that the cases relied upon by the respondent are factually distinguishable, but although there are factual differences, the courts found in such cases that a variety of transactions in essence constituted additional compensation. *Commissioner* v. *Duberstein,* 363 U.S. 278 (1960); *Pounds* v. *United States,* 372 F. 2d 342 (C.A. 5, 1967); *Nathan Putchat,* 52 T.C. 470 (1969), affirmed per curiam 425 F. 2d 737 (C.A. 3, 1970); *William H. Husted,* 47 T.C. 664 (1967); *Ruth Jackson,* 25 T.C. 1106 (1956); *Estate of Merlin H. Aylesworth,* 24 T.C. 134 (1955); *National Clothing Co. of Rochester,* 23 T.C. 944 (1955); *Fred C. Hall,* 15 T.C. 195 (1950), affirmed per curiam 194 F. 2d 538 (C.A. 9, 1952). The petitioners also suggest that only a part of the gain should be treated as additional compensation; however, we see no reason to justify any such allocation, nor any basis for making it. Finally, the petitioners argue that the transaction should not be treated as compensatory because the corporation did not deduct the amount paid for the stock. Such fact reflects merely that the corporation did not treat the transaction as compensatory; despite their view of the transaction, we must examine all the circumstances surrounding the transaction and apply the principles of law to those circumstances and conclude whether it was compensatory. *Commissioner* v. *Duberstein, supra.* In the light of the principles announced by such cases as *Smith* and *LoBue,* we find that the arrangement was to provide Mr. Worthy with an additional economic benefit for his services in connection with the Northgate development, and consequently, we hold that the amounts which he received for his stock constituted additional compensation.

The issue we must next decide is whether the dues paid to the club in 1967, 1968, and 1969 are deductible.

The issue involves sections 162 and 274. Section 162(a) allows a deduction for all the ordinary and necessary expenses of carrying on a trade or business. However, section 274(a)(1) provides in part:

(1) IN GENERAL.—No deduction otherwise allowable under this chapter shall be allowed for any item—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(B) FACILITY.—With respect to a facility used in connection with an activity * * * [generally considered to constitute entertainment, amusement, or recreation], unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business,

The deductibility of dues to a country club is governed by the rule of section 274(a)(1)(B). Sec. 274(a)(2)(A); sec. 1.274–2(e)(3)(ii), Income Tax Regs.; *William K. Coors*, 60 T.C. 368 (1973). In determining whether a club membership was used primarily for business purposes, section 1.274–2(e)(4)(i) of the regulations provides in part:

Generally, it is the actual use of the facility which establishes the deductibility of expenditures with respect to the facility; not its availability for use and not the taxpayer's principal purpose in acquiring the facility. Objective rather than subjective standards will be determinative. * * *

Whether the test is satisfied may be judged on the basis of the amounts spent for business purposes or the number of occasions the club was used for business purposes. Sec. 1.274–2(e)(4)(i), Income Tax Regs.; *William K. Coors, supra.* Section 274(d) also sets forth certain requirements for the method of substantiating any business use. Sec. 1.274–5(c)(6)(iii), Income Tax Regs.; *C. James Mathews*, 61 T.C. 12 (1973).

Mr. Worthy asserted that he maintained his membership in the country club primarily for business reasons—he testified that at the club he associated with many other businessmen in the community and that such associations helped his business. However, it is clear that such testimony fails to satisfy the requirement of objective proof as to the business use of the club. We need not pass on the question of whether the petitioners have met the ordinary and necessary test of section 162(a), for it is altogether clear that under section 274(a)(1) (B), they have failed to demonstrate that they are entitled to deduct any more of the club dues than has been allowed by the respondent. We also need not decide whether the substantiation requirements of section 274(d) have been satisfied, for even if we take into consideration all the evidence offered by the petitioners as to the actual use made of the club facilities, such evidence falls short of establishing that the primary use was for business purposes. The evidence presented on the question of the amounts spent by Mr. Worthy at the club indicates that over the 3 years, $450.61 was paid for expenditures other than dues, of which $38.47 was paid for business entertainment. These figures were reduced to $431.12 and $18.98, respectively, to reflect the fact that Mr. Worthy was reimbursed $19.49 by one of his business associates for costs incurred in the course of the associate's use of the

club. The charge tickets, which Mr. Worthy claimed reflected business use, show that, of the occasions during which Mr. Worthy and his family charged expenditures to their account, less than 10 percent were for business purposes, and the amounts charged for such business use constituted less than 5 percent of the amounts charged at the club for purposes other than the payment of dues. In the light of such evidence, we find and hold that the petitioners have failed to carry their burden of establishing that the notice of deficiency was incorrect.

*Decision will be entered under Rule 155.*

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.